# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

Case No. 2022  CV  222

**Complaint for Declaratory
and Injunctive Relief**

**FAMILIES A, B, C and D, on behalf of
themselves  and on behalf of all Florida
families with minor children,**

      Plaintiffs,

        **v.**

**RON DESANTIS, as Governor of Florida;
SHEVAUN HARRIS, as Secretary of the
Florida Department of Children and Families;
JOSEPH LADAPO, M.D., as the Executive
Director of the Florida Department of Health;
PATRICIA ARMSTRONG, as the Bureau Chief
of the Florida Department of Health Child
Protection Team; and
DENNIS MOORE, as Executive Director of the
Florida Guardian ad Litem Program,**

      Defendants.

## **COMPLAINT**

Plaintiff FAMILIES A, B, C and D, on behalf of themselves  and on

behalf of  all Florida  Families with Minor Children, sue Defendants RON

DESANTIS, as Governor of  Florida [Governor], SHEVAUN  HARRIS, as

Secretary of the Department of Children and Families [DCF], JOSEPH LADAPO, M.D., as the Executive Director of the Florida Department of Health , [DOH], PATRICIA ARMSTRONG,  as the Bureau Chief of the Florida Department of Health  Children's Medical  Services and the Child Protection Team [CMS or CPT],  and DENNIS MOORE,  as  Executive Director of  the Florida Guardian ad  Litem Program [GAL], and allege:,

## I.   JURISDICTION AND VENUE

1.     Jurisdiction is invoked pursuant to 28 U.S.C §1331 and 1343 in that this is a civil action arising under 42 U.S.C. 1983 to redress the Defendants' deprivation under color of state law of the rights, privileges and immunities secured to the relatives and children involved in the Florida foster system by the Constitution and laws of the United States and the State of Florida. The federal rights sought to be redressed are guaranteed by the Fourteenth Amendment to the United States Constitution.  This Court also has jurisdiction pursuant to 28 U.S.C. §2201 and 2202, as Plaintiffs seek injunctive relief prohibiting unlawful separation of children from their relatives and the unlawful internal diversion of foster children to system-connected

nonrelatives[1] and seek declaratory relief relating to their constitutionally protected familial associational rights and other equitable relief.

2.     Venue lies in Leon County, Florida pursuant to 28 U.S.C. §1391(b), as Plaintiffs' claims arise out of their relationship with the Defendants, in the course of the Defendants' operation of the Florida foster care system throughout the state; and a majority if not all of the Defendant officials have their place of business in Leon County, Florida, which is located in the Northern District of Florida, Tallahassee Division.

## II.   INTRODUCTORY STATEMENT

### A.  Florida's Foster Care System

3.     This is an action for declaratory and injunctive relief pursuant to 42 U.S.C. §1983 and the Due Process and Equal Protection Clauses of the United States Constitution and the Florida Constitution.

4.     This case involves the Florida foster care system, part of which is funded by Florida taxpayers, while the federal government funds the

---

[1] The nonrelative recipients to whom the children from the four Plaintiff Families were "internally diverted" included a lead agency Board Member and trustee, a licensed foster parent couple of whom one was a volunteer with the Guardian ad Litem Program, the other provided mandatory comprehensive behavioral health assessments [CBHA's] of foster children for the lead agency, a behavioral health specialist employee of a lead agency, and a social worker serving as a case manager, respectively.

balance. [The numbers for 2018 (the most recent available) show the federal government providing funds equaling some 61% [$776,840,104 of the $1,295,069,665 total], with state and local funding for the balance].

5.      Under state and federal law, the purpose of the foster care system is to provide for the care, safety, and wellbeing of minor children in Florida, with their families to be engaged in constructive, supportive, and non-adversarial relationships, with as little intrusion into the life of the family as possible. See, e.g. Fla Stat. §39.001 (2018, unless otherwise specified).

6.      Presently, Florida law recognizes the responsibility of the DCF to oversee the operation of the foster care system, including case handling of foster cases; DCF also directly handles initial investigations with the CPT and provides dependency system Children's Legal Services [CLS] attorneys to represent the State of Florida in the dependency case.

7.      When the Defendant Foster System Operators [DCF, CPT and, GAL  Program] believe that a child's safety warrants immediate removal from the Birth Parents while the Birth Parents participate  in a case plan to improve their ability to safely parent children, the Defendant Foster System Operators have a duty under both state and federal law to locate relative

4

caregivers to care for the children during the case plan phase of the dependency case under state and federal law. Only if there are no suitable, willing, and available relatives, is it appropriate for the children sheltered from their Birth Parents to be placed with nonrelative strangers.

8.     When there are concerns for the safety of children, parents can be monitored as they comply with services to complete their system-supervised case plans, with successful completion allowing reunification with the Birth Parents of their sheltered children.

9.     When Foster System Officials believe the facts and safety concerns warrant the immediate filing of a petition to expedite termination of the Birth Parents' parental rights, the system must, at the adjudicatory hearing [trial] meet the stringent requirements set forth in *Santosky v. Kramer*, 455 U.S. 745 (1982) (to terminate parents' fundamental rights to parent their children, the state must demonstrate by clear and convincing evidence that the parents abused or neglected the child and that the abuse or neglect harmed the child) and must demonstrate the absence of any less restrictive action that can protect the child. Discovery rules applicable in TPR cases are based on constitutionally protected due process considerations and reflect the expectation that foster system officials will provide Birth Parents

and the supervising dependency court judge not only factual evidence that will be relied upon at trial, but also evidence that is exculpatory for the accused parents, similar to the *Brady v. Maryland,* 373 U.S. 83 (1963), burden of providing all relevant information, including that which is exculpatory, as well as that on which the foster system operators may rely.

10.   If TPR is deemed appropriate and parental rights are ended, the foster system is obligated - as a matter of federal and Florida law – to update a diligent search for relatives to adopt the child and provide permanency for the child with available, safe relatives, as Florida's Legislature has codified the social work best practices to that effect, because the evidence shows that children who cannot be safely returned to Birth Parents do better when placed with relatives, rather than nonrelative strangers.

11.   Florida and federal law prohibit inappropriate interference with familial rights, especially when Foster System Operators engage in conflicts of interest, self-dealing and breaches of fiduciary duties to attempt to divert or take children from their biological families to nonrelative system-connected chosen ones, rather than following the legal mandates for diligent searches for family members, so that children not able to be returned to the Birth Parents are permanently placed with biological relatives.

**B. Florida's Foster System Increasingly Serves as a   Child Snatching /" Internal Diversion" System Taking Children from Families and Relatives and Letting Foster System Connected Staff Take Them**

12.    This suit addresses the failure of the Defendants to follow the laws relating to the minor children in Florida foster care and their biological relatives entitled to participate with those children, as provided by Florida and federal laws prioritizing the placement and permanency rights of biological and other family members.

13.    This suit seeks injunctive relief against the foster system personnel using the foster care system to identify and take children for themselves, away from biological kin, and addresses the unlawful "internal diversion" practices pursued by the Defendant Governor and those subordinates of his, who operate the foster care system, letting the operators of the system essentially have their choice of the minor children placed into the state's foster custody,  interfering with the children's relationships with their families, contrary to law.

14.    Plaintiffs also seek declaratory relief condemning the unlawful internal diversion/child snatching practices the Defendant Foster System Operators have been practicing, choosing either to ignore suitable relatives so they can effectuate the internal diversions and takings, or choosing to

ignore the ongoing duty to diligently search for relatives until they find relatives suitable to raise the foster child.

15.     To operate the system for internal diversion of children, Foster System Operators executing their responsibilities [including DCF, CPT, the GAL and DCF's contracted lead agencies] use a number of artifices and devices, and other outright unlawful actions, including, but not limited to:

     a.  Withholding key information[2] from the dependency court and Birth Parents and their attorneys about conflicts of interest between case managers and the interests of the children and their families, when system connected, personnel have decided to push to end the parents' rights and let the children be adopted by system-connected personnel, despite the laws providing otherwise;

     b.  Not providing the dependency court, or Birth Parents and their attorneys, with pertinent exculpatory information;

---

[2] Key information such as: the genetics lab test results showing evidence of a genetic mutation potentially indicating a brittle-bone type of disease in an otherwise unexplained fracture case [Family A]; choosing not to give Family B the prompt notice to which they were entitled when a full sibling of their adoptive daughter was born, and taken into foster care; withholding information from the dependency court that Foster System Operators did not want to update the family finding diligent search they were obligated to conduct and further withholding from the court that they were planning to internally divert and that there were numerous suitable relatives available for the Family C child; and withholding from the dependency court the accurate and truthful information about the Family D relatives.

c. Taking advantage of many dependency judges' lack of knowledge of the foster system and the resulting inappropriate reliance on the Foster System Operators;

d. Playing" hide the ball" with information needed by family members, blocking family members from access to hearings and information about how the system works, and what the case plans for permanency for the child are;

e. Using *ex parte* communications [contrary to Florida Bar Rule 4-3.5 and contrary to Judicial Conduct Rule 3-B7] to block access to the dependency court for relatives entitled to hearings under the Uniform Child Custody Jurisdiction Enforcement Act [UCCJEA] Fla. Stat. §§61.501-542) (2018);

f. Fabricating "evidence" against relatives and obstructing access to key medical information relating to children needed by the dependency court for a fair and impartial hearing;

g. Not obtaining, or withholding, medical information pertinent to the foster child, refraining from obtaining and attaching the child's medical records to judicial review social study reports, and choosing not to provide them to the Birth Parents and their

counsel, then withholding them from evidence in TPR proceedings that are the essential legal step in freeing a child for adoption;

h. Failing to conduct the requisite diligent searches for biological relatives of the child when a child is sheltered and then again throughout the case, and again, as required after a TPR judgement;

i. Choosing a nonrelative system-connected person for placement of a child instead of complying with the law and placing the child with relatives;

j. Having the lead agency [and, at times, a subcontracted case management agency] work with DCF to divert children to favored   non-relatives, rather than conducting the required diligent searches for relatives;

k. Improperly using a parent's attempt to get medical care for a child as an event triggering the shelter of the child, contrary to chapter 787, Florida Statutes;

l. Relying heavily on provisions in the Rules of Juvenile Procedure to misinterpret and preclude relatives from being properly

involved in the case handling for the child's case, trampling on constitutionally protected due process rights of relatives;

m. Taking advantage of the lack of knowledge of Birth Parents and their attorneys of the dependency system, and lack of experience of their attorneys with the dependency system;

n. Ignoring frequently [if not as often as possible] the due process rights of Birth Parents and other Relatives to be present with advance notice of judicial review proceedings and blocking Relatives from being heard in dependency court proceedings by their misuse of the "Participant/Party" Rule of Juvenile Procedure and the related statutory definitions in chapter 39, Florida Statutes.

o. In unexplained fracture cases, ignoring the *Santosky v. Kramer, supra* burden on Foster System Operators to prove the alleged abuse by the clear and convincing evidence, and improperly shifting the burden to Birth Parents and their attorneys to explain reasons for a child's condition when the reason  the child came to the attention of CPT and the other Foster System Operators was the parent's seeking medical treatment;

p. Compromising the ethical obligations of the attorneys for Birth Parents by paying the attorney for system-connected services inconsistent with the attorney's obligations to his or her clients;

q. Fabricating false reports of abuse attributed to a relative to justify failing to approve a relative for placement while attempting to place a child with a non-relative.

16.    When relatives who realized  how their related youngsters had been essentially kidnapped, snatched, or internally diverted,  complained to Defendant Governor directly or through the Inspector General for one or more of the Departments,   the   Defendant Governor and his minions, including  the  supposedly  independent  Inspector  General,  took  no independent action other than to redirect the complaints to  DCF and the other  Foster System Operators  themselves to handle, with no accountability or redress for the relatives of the snatched, diverted children.

17.    When  the  Defendant  Governor's  Foster  System  Operators created  false  reports  or  took  other  inappropriate  action  to  disqualify  a relative from DCF's consideration for temporary or permanent placement of a child, the Foster  System Operators withheld  from  the victim of their fabrication of reports   information available   as  to  how  the  wrongfully

disqualified relative could get the erroneous information corrected and removed, and get their names off the registry of abusers, such as by initiating an appeal to the Adoption Applicant Review Committee [AARC]. DCF's AARC has administrative jurisdiction to hear evidence relating to the disqualification and provide corrective and other recommendations relating to disqualifying background information, in addition to considering and recommending resolution of competing claims to be selected as the adoptive parents of a child whose Birth Parents' rights have been terminated.

### III. **PLAINTIFF FAMILIES**

### **Plaintiff Family A  - The Williamses**[3]

### **Snapshot  of  the Williams Family**

18.    The Williams Family includes a large number of relatives on both of the Birth Parents' sides, including many in Florida and other states. Birth Mother Taniyah Crutch-Williams had local relatives in the North Florida area in 2017 who included the children's maternal grandparents Lisa Crutch and Donald Crutch, three aunts and their families, and two siblings

---

[3] The adult Williamses prefer to use their actual names.  The minors' will be referred to as, Lil R., R.W. and T.W.

and their families, with additional aunts and uncles in the Tampa area. Other maternal relatives are in New York.

19.     Birth Father Rodney Williams, Jr.'s local relatives in the North Florida area in 2017 included the children's paternal-great grandmother, the children's paternal grandparents and paternal uncle and aunt.

20.     The adult members on both sides of the families are strongly middle or upper-class people, involved in businesses of their own or honorably working for others, many served in the military, all with honor, many obtained four- or two-year college degrees. The family members, including a number of additional maternal relatives in New York, stay in close contact with each other.

## Closer  Look  at the Williams Family

21.     Taniyah Crutch-Williams and her husband Rodney Williams, Jr. are the Plaintiff Williams Birth Parents. The Williams Birth Parents have three biological children: Lil R.W., III ("Lil R.", DOB 2015), R.W. (DOB 2017) and T.W. (DOB 2020). They bring this action on behalf of themselves individually and as the victims of the Defendant Governor's wrongful taking of their rights to parent Lil R. and R.W., and as the natural guardian of T.W., whose First Amendment sibling associational rights have been

wrongly interfered with; they also bring this action on behalf of other parents whose children were wrongly removed by Foster System Operators.

22.     The maternal biological grandparents of the three biological Williams children are Lisa Crutch and the late Donald Crutch. Maternal biological grandmother Lisa Crutch brings this action individually with respect to her associational rights with her grandchildren being wrongly interfered with, and with respect to the Defendant Foster System Operators falsely placing her name on the child abuse registry to disqualify her from serving as a relative caregiver for her grandchildren Lil R. and R.W. following the children's removal from Birth Parents in August 2017.

23.     The paternal biological grandparents of the three biological Williams children are Charlotte Williams and Rodney Williams, Sr. They bring this action individually and as legal guardians of their adoptive son Lil R. [who, with the termination of the Birth Parents' rights to parent Lil R. and R.W., also became the legal brother of their biological adult son Rodney Williams, Jr.].

24.     The named adult Williams plaintiffs are acting on behalf of themselves and on behalf of the plaintiffs and other relatives of children diverted from their biological family members to nonrelative foster system-

connected persons after state officials took children from their families and placed them in the foster care system operated by Florida's Governor through DCF, and through DOH and its CPT bureau.

### Plaintiff Family B – The Rogers Family[4]

25.     The Rogers Family Plaintiffs include David Rogers and his wife Charlotte Rogers, individually and as legal guardian of their Florida-born adoptive daughter Alexandra R. (DOB 2015).

26.     Alexandra has a full sibling brother [birth initials M.S.  DOB 2017) born in Florida and taken into foster care on May 11, 2017.

27.     The Rogers Plaintiffs are residents of North Carolina and bring this action on behalf of themselves and as legal guardian of their adoptive daughter for the violation of their familial legal and associational rights with Alexandra's full-blooded brother, and of Alexandra's constitutionally protected familial associational  rights  with her  full sibling.

28.      They  are also  acting on behalf of other parents of adopted children for whom Florida foster system officials owe a duty under federal and Florida law, and the DCF's own regulations, Fla. Admin. Code § 65C16.002(3) to

---

[4] The name "Rogers" selected for this Plaintiff Family is a pseudonym to protect the Rogers Family Plaintiffs as the adoptive parents of a child identified by pseudonym, Alexandra R.

provide prompt notification of the sheltering of a full  or half sibling of an already adoptive child, so that the adoptive parents of such siblings can be given their entitled priority over nonrelatives in the temporary and permanent placement of later-sheltered biological foster siblings.

29.     Finally, they bring this action on behalf of those in other states for whom the Florida Uniform Child Custody Jurisdiction Enforcement Act [UCCJEA], statute is applicable to protect the due process rights of meaningful notice and an opportunity to be heard when a Florida court is considering custody and temporary or permanent placement of minor children in Florida foster care.

## Plaintiff Family C  - The Mitchells[5]

## A Snapshot  of the Mitchell  Family

30.     The extended Mitchell Family includes many maternal relatives of Regan's in Florida during the time following her birth in 2015, including  great, great aunt Kathy Gomez, great aunts April Maxwell and Dale Felton and their families, and grandfather Pedro Morgan and his minor daughter. There were numerous  other  maternal  relatives  in  Massachusetts,  including  great  aunt

---

[5]  The surname "Mitchell" is a pseudonym to protect the privacy of the relative minor child internally diverted from the Mitchells; the Mitchells' minor child relative will be referred to by a pseudonym, Regan M, her siblings by pseudonyms Alicia M. and Chelsea D.

Kendall Mitchell [background in preventing childhood abuse and trauma, early childhood education, raised three daughters, all college educated], in addition to the Birth Fathers of Regan's two half-sisters, Chelsea D. and Alicia M. Spencer DaCosta is the Birth Father of Chelsea D; his then-fiancé/now wife Anna DaCosta is a nurse. All   family members have solid family values and would have passed a properly administered home study, and all were willing and available to raise Regan if the family placements with the Florida relative families did not work out.

31.    The extended Mitchell Family consists of numerous relatives of the minor child Regan M. (DOB 2015). Those involved as Plaintiffs here include maternal great aunt Kendall Mitchell, who applied to, and who was approved to, adopt Regan. Plaintiff Mitchell brings this action individually and on behalf of those approved by the Adoption Applicant Review Committee [AARC] but whose attempts to adopt their relatives were thwarted by the internal diversion efforts of foster system officials despite the AARC approval.   [The DCF publication explaining the AARC, and its role is attached as Exhibit 1].

32.    Regan has two half siblings, Alicia M. (DOB  2010) and Chelsea D. (DOB  2014); all three sisters share the same Birth Mother.  Spencer and Anna DaCosta bring this action individually and as the natural and legal guardians

of daughter Chelsea D. Milton Murphy and Melanie Murphy bring this action individually and as the natural and legal guardians of daughter Alicia M. Both sets of guardians of Regan M.'s half siblings also bring this action on behalf of parents and custodians of children whose siblings and half siblings were internally diverted to nonrelative foster system-connected personnel.

33.    With her own two children, great aunt April Maxwell and her partner Marcus Diamond served as relative caregivers for Regan for more than two years. They bring this action for themselves individually and as natural and legal guardians of their two minor children Everett M. (DOB 2005) and Hilarie M.  (DOB 2006), and on behalf of other relative caregivers from whom the foster system-connected folks diverted a minor child, after presenting the dependency court with erroneous information about them, and improperly and incorrectly telling Plaintiff  Diamond he had no right to come to court or to be heard.

34.    Great aunt Dale Felton and great uncle Slade Felton and their children Jaclyn [2010]and Laurel F. [2013] also served as relative caregivers for Regan, with the children having a sibling type relationship before Regan was improperly and prematurely diverted from their home to be taken by nonrelative system-connected personnel. They bring this action on behalf of

themselves individually and as natural guardians of their two minor children and on behalf of other relative caregivers from whom the nonrelative foster system-connected staff wrongly diverted a minor child.

35.     Regan M.'s biological grandfather Pedro Morgan brings this action individually and on behalf of his minor daughter  Karla M. (DOB 2004), who for more than a year, had a sibling relationship with her biological niece Regan, and also brings this action on behalf of biological grandparents of minor children who are deprived of contact with their grandchildren despite Florida legal provisions that require Foster System Officials to make sure there is an evidentiary hearing to address and provide for ongoing contact between the biological grandparents and their grandchildren.

### Plaintiff Family D – The  Budloves[6]

36.     The Budlove Family Plaintiffs  include the Plaintiff Birth Mother Brittany Budlove and her biological daughter, T.B.  [DOB 2019], maternal grandmother Judy Miller  [retired owner/operator of  a McDonald's,  moved to Florida to be near  the Birth Mother and grandchild T.B.],  maternal  aunt Chauntina Kern  [in-home healthcare worker for nine years] , maternal  aunt

---

[6] The Birth Mother and her relatives have chosen to  use the actual names of the adult  Plaintiffs,  with the actual first name  of the child

Kiesha Kern [truck driver for metals company for more than ten years], maternal uncle Gregory Nunley [has worked at Tootsie Roll Factory in Chicago for 20 years], maternal great uncle Dr. Richard Nunley [teacher for Chicago Public School system for nearly 40 years, [maternal great aunt Felicia Nunley [elementary school teacher for more than 20 years], maternal cousin Dr. Danielle Nunley [pharmacist/pharmacy manager], and maternal cousin Simone Wilson [licensed therapist and clinical social worker for more than seven years].

37.   The maternal relatives are all willing, available, and appropriate to care for T.B.

38.   The Birth Parents were divorced in February 2021; the Birth Father is not involved.

39.   Of eight maternal relatives, many of whom initially had their home studies approved, the Defendant Foster System Operators have nevertheless chosen thus far to exclude them as caregivers for their relative T.B. so that a nonrelative system-connected custodian can have T.B.

40.   The maternal relatives named personally reached out to the assigned case management and their agency and were rebuffed and or

purposely misguided regarding their request to obtain custody of their young family member

41.     The Birth Mother Plaintiff brings this action individually and on behalf of the wrongful deprivation of familial associational rights with T.B., and on behalf of all others similarly situated.

## IV.  DEFENDANTS

### A.     Defendant Governor DeSantis

42.     Defendant DeSantis is the Governor of the State of Florida, the head of the executive branch of Florida's government and the person responsible for the proper operation of the foster care system, including the portions of the system operated by the Florida Department of Children and Families [DCF], the Children's Medical Services [CMS] and Child Protection Team [CPT]. By law Defendant Governor is responsible for the proper administration of DCF, assuring DCF operates in conformity with State and federal law and in compliance with the agreement with the federal government under, inter alia, the Adoption and Safe Families Act and the Family First Prevention Services Act of 2018, which parallels Florida legislative changes adopted in 2018.

43.     Defendant DeSantis is sued in his official capacity.

44.     As executive officer of Florida, the Defendant Governor is responsible not only for the hiring and continued employment of Shevaun Harris, Secretary of DCF and of Joseph Ladapo as Executive Director of DOH, but also to make sure that CPT Bureau Chief Armstrong and the CPT personnel are not abusing their positions.

45.     Defendant DeSantis is also responsible under State law for oversight of DCF compliance with the mandatory provisions of Chapter 39, Florida Statutes and Chapter 65C of the Florida Administrative Code relating to dependency cases,  foster care and termination of parental rights and is responsible for ensuring DCF protects the federally protected civil rights of foster children and their biological families by ensuring that once children are removed from their biological parents, they are placed with biological family members if they cannot be safely returned to their Birth Parents.

46.     Defendant DeSantis is also responsible for making sure that the Foster System Operators do not provide perjured testimony to the dependency courts, do not withhold pertinent information, or mislead the court about applicable law, and to make sure those operating Florida's foster system follow the law, rather than ignoring it to unlawfully separate foster children from their relatives so they can be placed with nonrelative system-connected personnel.

47.   Since Defendant DeSantis assumed office in January 2019, he has overseen the operations of Florida's foster care system and tolerated actions taken by the other foster system-connected Defendants in a manner contrary to law.

## B.  Defendant Shevaun Harris

48.   Defendant Shevaun Harris is sued in her official capacity as Secretary of the Florida Department of Children and Families [DCF]. Defendant Harris is the Florida foster system official responsible for the proper operation of the foster care system in the state of Florida, a system operated in accordance with federal and state law, for which the federal government provides more than 60% of the annual funding to operate the system.

49.   State and federal law require Florida [and, in accepting federal funds, the State of Florida agreed] to diligently search for biological family members for the placement of children in their legal custody, providing priority to family members for temporary and permanent placements, prior to placement with either a licensed foster care home or placement with non-relatives in a non-licensed home.

50.   As a matter of Florida public policy and law, federal lawmakers and Florida's Legislature have found that, as acknowledged by social workers and

case managers, foster children do better when placed with biological relatives, rather than nonrelative strangers; even DCF's own policies, procedures and Florida's Administrative Code provisions reflect DCF's recognition of the importance and requirement for contact between children removed from their families and their biological relatives.

## C.  **Defendant Dennis Moore**

51.    Defendant Dennis Moore is sued in his official capacity as executive director of The Guardian ad Litem Program of Florida [GAL], a Florida program which is tasked with advocating for the best interest of children in the foster care system.  GAL was designed as an advocate for children removed from their families, to promote and protect sibling contact, provide a safety net and oversight for the needs of children to assure case plan, therapeutic and medical services are provided to the children in the foster care system as well as ensure compliance by all of the Chapter 39 of the Florida Statutes, and the other applicable state and federal laws.

## D.  **Defendant Ladapo**

52.    Defendant Ladapo, M.D. is sued in his official capacity as the executive director [formerly called Secretary] of the Florida Department of Health, the department charged with providing medical foster care and other

health services in the foster care system through Children's Medical Services [CMS] and the Child Protection Team [CPT].  CMS provides direct medical services and coordinates medical services for children in the foster care system, especially for children designated as children with medical needs. CPT is a bureau within DOH that conducts forensic evaluations and medical evaluations of children after reports of abuse after abuse investigations are initiated through the Florida Abuse Hotline; each district's regional CPT office has a medical director to oversee allegations of abuse and neglect, and to determine if a child has injuries attributable to abuse or neglect, rather than a medical or other condition not attributable to abuse or neglect.

### E.  **Defendant Pamela Armstrong**

53.   Defendant Armstrong is sued in her official capacity as Bureau Chief of CPT and CMS. She is responsible to make sure CPT personnel conduct their assessments properly and in accordance with applicable protocols for each office's Medical Director and Nurse Practitioner. CMS provides direct medical services and coordinates medical services for children in the foster care system, especially for children designated as children with medical needs.

## V. STATEMENT OF FACTS AND CLAIMS FOR RELIEF

### A. First Count: The Williams Family

54.    The Williams Family Plaintiffs reallege paragraphs 1 through 24, and 42 through 53, and further allege:

55.    Plaintiff Birth Parents Rodney Williams, Jr. and Taniyah Crutch-Williams consider themselves African American. The Birth Parents are residents of Clay County, Florida.

56.    Taniyah Williams and Rodney Williams, Jr. are the biological parents of three children: Lil R. W. III ["Lil R."], R.W., and T.W. Lil R. was born in June 2015, R.W. in May 2017, and T.W. in May 2020.

57.    Lil R's birth posed no special problems, but the birth of R.W. was traumatic for both the mother and child with a number of medical issues. The labor was prolonged by the labor and delivery staff needing to address issues of the umbilical cord being wrapped around R.W.'s neck. Persons present stated that R.W.'s clavicle had to be broken to facilitate the delivery. The medical records contain documentation that R.W. had a heart rate of 0 (zero) and an initial Apgar of 1 (one); an Apgar of 1 (one) indicates clinically deceased. Hospital staff took R.W. to the NICU for several hours to help stabilize her and make sure she continued breathing.

58.    Photographs of R.W. shortly after her birth show several bruises to her face and body.  The bruising occurred during the intensive labor and delivery process.

59.    Pediatrician Dr.  Khalil Wallizada was the primary pediatrician for Lil R. Dr. Wallizada became R.W.'s primary pediatrician at  birth. During R.W.'s initial visit with Dr. Wallizada he documented the fractured clavicle.

60.    Within weeks of R.W.'s birth,  both of the Birth Parents attended R.W.'s well  baby check-ups with Dr. Wallizada. Additionally, R.W. had numerous ER hospital visits due to other health concerns. In June 2017, R.W. visited Orange Park Medical Center [OPMC]'s emergency room with a health concern.   Because the Birth Mother continued to have concern with the medical diagnosis at OPMC, the day after R.W. was discharged from OPMC, the Birth Mother took R.W. to Wolfson Children's Hospital [Wolfson]'s emergency room, where R.W. was admitted due to difficulty with feeding, constant vomiting, and elevated temperature. R.W. remained at Wolfson for several days, during which a spinal tap was performed.  After discharge from the several day Wolfson stay, in August 2017, the Birth Mother took R.W. to the Wolfson emergency room because of concerns about the way R.W., then approximately 12 weeks old, seemed to be unusually favoring her left leg,

after R.W. cried out during a diaper change. . An x-ray was done, and a fracture of the femur was diagnosed. A full skeletal survey was then ordered. The skeletal survey showed a femur fracture, fifteen (15) rib fractures at various stages of healing, a possible spinous process fracture of the T12 vertebrae, a healing clavicle fracture and two jaw fractures at various stages of healing.

61.    Pediatrician Dr. Wallizada had noted R.W. was born with blue sclera.  Because of the results of the blue sclera and the results of the skeletal survey, Dr. Wallizada clinically diagnosed R.W. with Osteogenesis Imperfects, a brittle bone disease. He saw no indications of any abuse of R.W. by either Birth Parent or anyone else.

62.    Although Dr. Wallizada had previously diagnosed R.W. with a brittle bone disease, possibly Osteogenesis Imperfecta, and knew the Birth Parents to  be conscientious, good parents of both Lil R. and R.W., an improperly   supervised  advanced registered nurse practitioner [ARNP] employed by and collaborating with the CPT had concerns the femur fracture and all  the other broken bones  may have resulted from abuse.

63.    DCF asked the Clay County Sheriff's Department to investigate criminal child abuse of R.W.. Law enforcement investigated. The case was

closed with no criminal charges, no probable cause was found based on the input from  pediatrician Dr. Wallizada.

64.     DCF nevertheless filed a shelter petition with the dependency court on August 30, 2017.  At that hearing, the judge granted DCF's request to remove Lil R. and R.W. from the care and custody of the Birth Parents.

65.     DCF disqualified maternal grandmother Lisa Crutch as a possible relative caregiver.   DCF and lead agency Kids First of Florida [KFF] caseworkers falsely claimed that the maternal grandmother Lisa Crutch had abused her own son years earlier and falsely claimed the grandmother was erroneously listed on the abuse registry as a child abuser.

66.     Maternal grandmother Crutch disputed the charges of abuse in writing and spoke to the DCF Inspector General.   During that call, the representative from the DCF Inspector General asked, "Why is your name connected to cases that have nothing to do with you?" That representative gave no further information to maternal grandmother Crutch, other than he would relay the anomaly to his supervisor.   The non-abusive maternal grandmother later received a suspicious unsigned, obviously fabricated "Confidential Investigative Summary" report showing both maternal grandparents [Lisa Crutch and her late husband "Don"] as child abusers. The

name of the maternal grandfather shown on the report was not a name her husband Donald Crutch used; the birth dates shown for Mr. and Mrs. Crutch incorrect, and the age of the alleged "child" abuse victim was listed as age 18.

67. DCF improperly gave no further information to the maternal grandparents about their right to get the records corrected and their names removed from the abuse registry. They did not provide information about the AARC process or any other process that Ms. Crutch could pursue to correct the significant mistake.

68. There were several other relatives of the children and Birth Parents in the area at that time in 2017, including paternal great grandmother Barbara Evans, some aunts, and the paternal grandparents, all of whom were suitable, willing and able to take both of the children, to keep them together, if the children could not be returned to their Birth Parents at the shelter hearing or later.

69. At the time of the August 2017 shelter hearing, R.W. was still in the hospital. The genetic testing ordered by Dr. Wallizada had been cancelled, apparently by CPT and the genetic testing ordered elsewhere, apparently by CPT, without the approval of Dr. Wallizada, had not yet been performed; there were no genetic test results available.

70.    Despite the numerous relatives available, DCF and the other Foster System Operators convinced the dependency judge that R.W. should go to nonrelative stranger care upon her release from the hospital, while Lil R. would be placed with the maternal great grandmother Barbara Evans, thus separating the children, without the mandatory sibling separation assessment being done.  Additionally, the Defendant Foster System Operators provided very few sibling visits between Lil R. and R.W., from the time they were placed separately, continuing to this day, completely contrary to law.

71.    At the request of the Defendant Foster System Operators, the judge ruled that the Birth Parents could have supervised visitation with the two children, with great grandmother Evans supervising visits with Lil R. and the Clay County lead agency KFF (on behalf of DCF) facilitating visits for the Birth Parents with R.W.

72.    Pursuant to Chapter 39, DCF (which used to directly operate the foster care system, but now supervises private contractors' operation of the system, other than the investigative and legal representation parts of the system) had contracted with KFF to handle the case management of the dependency case and serve as the lead agency responsible for operating the system in Clay County. Pursuant to KFF's contract with the State of Florida

and DCF, KFF is mandated to fully comply with both federal and Florida laws regarding its operational foster system responsibilities.

73.     With the shelter detention order, case management responsibilities moved from the Defendant Foster System Operators, including DCF and CPT, to the lead agency, and the GAL Program was officially appointed.

74.     On October 10, 2017, with input from CPT, DCF filed a petition for an expedited termination of the Birth Parents' rights regarding both Lil R. and R.W., alleging without justification that both parents had engaged in acts of physical abuse towards both children. DCF's decision to pursue the expedited TPR goal rather than offering the Birth Parents a case plan was supported by the Defendant Foster System Operators and lead agency KFF, but contrary to and unsupported by the available information.

75.     When R.W. was released from the hospital, she was initially placed in a medical foster home operated by the CMS part of DOH [the same department in which CPT is housed], rather than the traditional foster care part of the foster care system under DCF control and oversight. On or about October 17, 2017, Defendant Foster System Operators moved R.W. to a nonrelative non-medical licensed foster home under DCF supervision, rather than to relative care as state and federal law required.

76.   Contrary to federal and state law's- required prioritization of relative placement of R.W., the Defendant Foster System Operators secretly chose to place R.W. with nonrelative system-connected foster parents, one of whom was a member of lead agency Kids First of  KFF  [KFF] board and a trustee of the KFF   Foundation. Not only did state and federal law prioritize placement of R.W. with her relatives, but pertinent policies and procedures prohibited  the self-dealing and favoritism of KFF nonrelative personnel over relatives  The Defendant Foster System Operators as well  as KFF willfully and negligently failed to disclose to  the dependency judge  the internal diversion they were arranging and failed to disclose  the disqualifying connection between the system-connected nonrelatives foster parents and the lead agency to the dependency court judge, the Birth Parents and their counsel, and other relatives of R.W.'s.

77.   At the time of the unlawful internal diversion of R.W. to the KFF board member and KFF Foundation trustee, the licensed foster father was serving a several year term as a member of the KFF board of directors and also served as a volunteer trustee for the KFF charitable, non-profit foundation, where he handled many tasks, including signing the corporate tax returns

submitted to IRS and other state-required forms required for KFF's solicitation of funds to continue.

78.    Without any credible explanation as to why the Defendant Foster System Operators and lead agency KFF chose not to comply with the laws and place R.W. with her relatives, the same Defendant Foster System Operators and lead agency KFF chose not to offer any information as to why they would place R.W., an African American child, with nonrelative, system-connected foster parents who are Caucasian.

79.    Despite knowing that children who cannot be returned to Birth Parents have better outcomes when they are placed with relatives rather than nonrelative strangers, Defendant Foster System Operators [including the GAL Program] inexplicably and unlawfully chose to disregard R.W.'s best interests and instead  placed R.W. with the KFF board member and his spouse, despite the availability of paternal grandparents Rodney Williams, Sr. and Charlotte Williams, the paternal great grandmother Barbara Evans, maternal grandparents Lisa and Donald Crutch and various aunts and uncles, all of whom resided locally, and ignored numerous other relatives who were available, willing and appropriate to take, and care for, Lil R. and R.W., to

keep them together, in one home. Family requests for regular, routine family visits with R.W., including with Lil R., were denied.

80.     While R.W. was in the hospital in August 2017, Pediatrician Dr. Wallizada ordered genetic testing on R.W. at UF Health, specifically for the bone disease Osteogenesis Imperfecta he suspected that R.W. had. Unbeknownst to Dr. Wallizada, a CPT staff person cancelled Dr. Wallizada's order without consulting with or clearing the change with him. The order for genetic testing at the UF Health Wolfson facility where R.W. was, was canceled and changed to genetics testing at Nemours Children's Hospital, where R.W. was not then located. At the time of the shelter hearing, R.W. was still in Wolfson Hospital. The genetic testing ordered by Dr. Wallizada had been canceled at Wolfson, and changed to Nemours, but had not yet been performed at Nemours. There were no genetics test results available at the time of the shelter.

81.     In November 2017, while in foster care with the nonrelative KFF-connected foster parents, R.W. underwent genetic testing; the results became available to the Defendant Foster System Operators in December 2017. Unbeknownst to the Birth Parents at the time, the test results indicated R.W. had an abnormal bone disorder. Although the bone disease R.W. has turned

out not to be the lethal Osteogenesis Imperfecta [OI] disease suspected, the results showed she had a form or variant of OI. Specifically, as shown by the December 2017 lab test results, R.W. has one single genetic mutation which caused the LEPRE1 gene to dysfunction. Further genetic testing, ordered in 2018 with the results not available until March 2018 after the conclusion of the TPR adjudicatory hearing showed R.W. also has the BRAC2 gene which 100% pathogenic (a gene leading to an aggressive form of breast and ovarian cancer). R.W. also has been diagnosed with a sickle cell trait. [It is notable the BRAC2 genetics test results list the "father" as having given a specimen for genetic testing; he did not].

82.    Information available indicates that Nemours   staff told the Foster System Operators the test results were complete by January 3, 2018 and were made available  to  Foster  System Operators shortly thereafter,  but the Foster System Operators never filed the complete December GeneDX lab test results with the court, did not offer the results in evidence,  and did not provide the complete results  to the Birth Parents.

83.    Defendant Foster System Operators and lead agency KFF and the Caucasian nonrelative system-connected foster parents were in receipt of the OI bone disorder variant information prior to the TPR trial.

84. The Defendant Foster System Operators did not put the bone disorder results from GeneDX [attached here as Exhibit 2] into evidence during the trial, and the x-rays were not displayed or used during questioning of any witnesses. An entry for the January 3, 2018, judicial review noted that the results were in on the testing for the Osteogenesis Imperfecta but were waiting for further review at Nemours. Although Defendant Foster System Operators introduced as their Trial Exhibit #6 "Nemours Hospital Genetic Report", that exhibit [attached here as Exhibit 3] contained only a two-page, undated letter from Dr. Georgianne Arnold, geneticist, with three pages of apparent literature; the exhibit contained none of the pages of the GeneDX laboratory results themselves.

85. The dependency court judge was waiting for the results even after the TPR trial concluded on March 2, 2018, and indicated the TPR ruling would potentially be reconsidered when the Foster System Operators filed them, but the Foster System Operators never did file them, and never backed off their claims at the trial  that R.W. was a perfectly healthy child other than abuse – yet there was no evidence of any abuse of R.W. by either Birth Parent!

86. Shortly after the trial, the Defendant Foster System Operators - who had the OI results since December 2017 - also received the additional genetic

results that had been pending at the time of the trial. The Birth Parents were not given the complete test results of either genetics tests done, either for the OI or the full panel ordered in early 2018 and had difficulty obtaining them despite many years of documented efforts. The Birth Parents did not receive the complete set of OI genetic test results until February 2022. All of the Defendant Foster System Operators and those working with them, including Nemours Children's Hospital concealed the results from the dependency court, the Birth Parents and their attorneys.

87.    It was not until February 2022 that the Birth Parents received the complete OI lab test results, showing that while R.W. did not have the lethal OI with two mutations, she had one recessive gene mutation, known as LEPRE1, which has been described as a variant of OI. Yet despite knowing the trial court wanted the results, the Defendant Foster System Operators chose to withhold the scientific documents that exposed the lack of evidence supporting their claims, just as they had withheld from the dependency judge that they had wrongly and unlawfully handled the case so that nonrelative system-connected board member/trustee and wife could have R.W..

88.    In addition to withholding the genetics test results, and despite their claims to the dependency court that R.W. was a perfectly healthy child,

the Defendant Foster System Operators and lead agency engaged in further ignoring of their obligations to provide the court and Birth Parents with complete copies of all medical records of children in the foster care system.

89.    Despite their obligation to   provide the Birth Parents and dependency court with R.W.'s complete medical records,  none of  the Defendant Foster System Operators provided either the dependency judge or the Birth Parents the complete genetics test results or R.W.'s extensive records regarding  medical care provided to her between August 30, 2017 and the TPR trial;  the Birth Parents had difficulty obtaining them, not receiving the December 2017 GeneDX lab results until February, 2022 The Birth Parents still not have received all of  the records of medical care the Foster System Operators subjected R.W. to, and obtained for R.W., between the time of shelter and the time of the adoption, but  for  which the Birth Parents began receiving  explanation of benefit forms from the health insurance company of the Birth Mother, which also  provided health insurance coverage for Lil  R. and R.W.

90.    At the TPR trial, it appeared the Defendant Foster System Operators had chosen to make two points: (1) R.W. was perfectly healthy; (2) R.W. did

not have Osteogenesis Imperfecta, ignoring the other genetic findings showing she was not "perfectly healthy.:

a. Either because they did not understand the science, or because they were trying to mislead the dependency judge and others, the Defendant Foster System Operators withheld from the judge records relating to more than $70,000 in bills for health care services for R.W. [some $25,000 billed for the OI and the complete battery of other genetics tests ordered by Defendant Foster System Defendants, and more than $49,000 for other health services for an immunologist chosen by the Defendant Foster System Operators].

b. Federal and Florida law required that ALL of the child's medical records be promptly obtained and fully provided to the court and the Birth Parents no less often that with the submission of the judicial review and social study reports that must be filed no less frequently than every six months, and more frequently as records became available.

c. The Defendant Foster System Operators apparently directed that the thousands of dollars for bills for the care they believed the "perfectly healthy" R.W. needed be sent to the health insurance

company of the Birth Mother, who received the explanation of benefit forms after the TPR trial was over and the Birth Parents' rights had been ended.

d. As to the OI testing, instead of putting the complete lab results in evidence, the Defendant Foster System Operators put none of the actual lab results in; instead, they submitted an undated letter to buttress a witness called to say that R.W. did not have OI. The witness did not explain the actually found genetic mutation of the LEPRE1 mutated gene. Clearly the actual lab results did not show a "perfectly healthy" child, but one with a variant form of OI, or a different bone disease

e. The Defendant Foster System Operators also did not share with the dependency judge or the Birth Parents at any time the appellate court opinion from  Pennsylvania, *In the Interest of N. M.,* 2018 PA Super 119, 186 A.3d 998 (2018)[Exhibit 4 attached] which involved a child with the LEPRE1 gene mutation, and in which the appellate court examined the science involved with mutated gene in question against the backdrop of  an unexplained fracture situation and

found – as here – no evidence of any parental abuse and reversed the TPR.

91.    At the February 23, and March 2, 2018, trial the Defendant Foster System Operators did not meet their burden of demonstrating that the Birth Parents committed any act of abuse or neglect of Lil R. or any abuse of R.W. that caused the child's fractures. Stated differently, while the evidence demonstrated, and no one denied, that R.W. had fractures of different ages, the Defendant Foster System Operators simply did not meet their burden of proof, to show that clear and convincing evidence established any parental abuse or neglect that caused harm to one or both of the children. All that the proof presented showed, at most, was no injury whatsoever to Lil R., and as to R.W., a bone disease not fully worked up. Looked at in retrospect with the hidden and concealed evidence visible, there is no support for the Defendant Foster System Operators claiming they met their burden of proof. Instead, what is clear is the deliberate mis-operation of the foster care system and ignoring of the law to get the KFF director/trustee and his wife a child they had no right to, using fraud on the court stealing and diverting R.W. away from her family.

92.   Counsel for the Defendant Foster System Operators tried to mislead the dependency judge about their burden of proof, saying they did not have to prove abuse or neglect, that the fractures were enough in the absence of appropriate explanation from the Birth Parents. Counsel for the Defendant Foster System Operators, including trial counsel for DCF and GAL, were wrong.  The United States' Supreme Court opinion in *Santosky v. Kramer, supra,* still applies. This is simply not a burden-shifting situation. The Defendant Foster System Operators had the entire *Santosky* burden throughout and did not meet it.   Pediatrician Wallizada's testimony established his belief and professional assessment about R.W. having a bone disease that resulted in unexplained fractures. Dr. Wallizada expressed his assessment to the Birth Parents that R.W. had a bone disease resulted in the fractures. During a phone conversation on January 8, 2018, even geneticist Dr. Arnold told Dr. Wallizada that R.W. had a form of Osteogenesis Imperfecta.

93.   There was no evidence adduced at the TPR trial the Birth Parents were neglectful; they had taken both Lil R. and R.W. for medical care whenever warranted, just as they did in August 2017, looking for information as to whether there was something wrong with R.W.'s leg.

94.    To have the Defendant Foster System Operators take over R.W.'s care from Dr. Wallizada in an attempt to make a case for which there was no evidence, the Foster System Operators overstepped their bounds. It is not the role of the CPT or the other Foster System Defendants to interject themselves into ongoing health care of Florida's children when the primary doctor is one licensed and credentialled by the Department of Health Medical Board, as Dr. Wallizada was, and is. It is also unlawful to withhold from the dependency court judge all of the medical records they should have promptly obtained and provided, to the court and the Birth Parents. That they took these actions to accomplish the taking, the internal diversion, of R.W. to the nonrelative system-connected board member/trustee affiliated with the very lead agency responsible for handling the case evidences the "thumb on the scale" approach the Foster System Operators used, while concealing the self-dealing and other misdeeds from the dependency court judge and the Birth Parents.

95.    When viewed, the actual lab test results provided an explanation for R.W.'s condition that resulted in or contributed to the fractures. While the results show R.W. did not have the full, more severe form of OI, the GeneDX lab results show that R.W. tested positive on the LEPRE1 gene that

caused dysfunction of the gene. Additionally, R.W. inherited from her biological mother the 100% pathogenic BRAC2 gene and the sickle cell trait.

96.     In its closing argument, with the lab results not in evidence but of   which DCF's attorneys were aware, the DCF attorney misrepresented that R.W. did not suffer from OI or any other bone disease related to the fractures and incorrectly claimed  - again without the lab test results being before  the court that there were no variants linked to any lesser form of OI found in R.W.,  continuing the fraud on the dependency court.

97.     Plaintiff Birth Mother Taniyah Crutch-Williams had private health insurance in effect at the time of her pregnancy with R.W. Although the Defendant foster system operators were careful to  not attach to  the judicial review reports  R.W.'s medical records that they had obtained, and falsely claimed at the trial that, apart from what they contended was parental abuse, the genetic testing showed that R.W. was a "perfectly healthy child" who had no brittle  bone disease whatsoever,  the  insurance information "explanation of benefits" forms the Birth Parents obtained  after the TPR trial showed  that the Defendant Foster   System Operators subjected R.W. to extensive testing between the time of the detention hearing in late August 2017  shelter and the adoption of R.W. in July 2019.

98.    The bills sent to the Birth Mother's health insurance for the two rounds of genetics testing done totaled more than $25,000; additional medical diagnostic and treatment apparently requested by CPT or DCF to be done by doctors associated with Nemours Children's Hospital added more than another $49,000 in bills submitted to the insurance company. Why was that information not put into evidence at the trial? Why was it not given to the dependency court judge, the Birth Parents or the custodial relatives of Lil R. to let them see what health issues R.W. had, and what health issues the other children should be tested for? This information would have exonerated the Birth Parents and, as importantly, would have informed the Birth Parents and Adoptive Parents of Lil R. of the health issues R.W. had, and the issues pertinent to the health of Lil R.

99.    These test results, especially the 100% pathogenic BRAC2 gene, were detrimental to the health of all the children, as well as the Birth Mother and the extended family. Although the Defendant Foster System Operators provided the full results and genetic counseling to their system-connected foster parents who had R.W., they withheld that information from the Williams family, which did not learn of the cancer gene until during later-born T.W.'s dependency case had been filed against them in 2021, some three

years later! The judicial review reports show the favored system connected KFF board member/trustee were given full access to the information, again with no reason for withholding the information from the Williams family and its members.

100.   After the TPR trial started on February 23, 2018, but the day before the scheduled conclusion of the TPR trial was to take place on March 2, 2018, the Birth Parents had a brief supervised visit with daughter R.W., then approximately ten months old. The Birth Parents were optimistic that their nightmare would soon be over, expecting the trial to end with R.W. being returned. It was the Birth Father's birthday. Lead agency case mangers supervised the visit between the Birth Parents and their beautiful daughter; after it was over, the lead agency case managers told them that would be the last visit, and it was. They have not seen R.W. since.

101.   On March 2, 2018, the trial judge heard final procedural matters and closing arguments, said he would review the evidence and set the case for a status conference on March 13, 2018.

102.   On March 9, 2018, with nothing in the 2017 dependency case record revealing the connection between KFF and the foster parents, or  the blatant conflict of interest existing  between the KFF case managers being

responsible for handling Lil R. and R.W.'s dependency case on the one hand, while having to be accommodating to the desires of the nonrelative system-connected licensed foster parents/Board member/trustee, without the lab results and extensive medical records the court and Birth Parents should have been provided before the TPR trial, apparently unaware of all of the information the Defendant Foster System Operators had withheld, the dependency court entered an order terminating the parental rights of both parents to both Lil R. and R.W. after adopting the Defendant Foster System Operators unsupported contention that R.W. was a victim of abuse. This travesty of justice was the product of the Defendant Foster System Operators' disdain for truth and law, its disdain for the judicial branch, their belief they are entitled to get away with whatever they want, as well as untruthful testimony of CPT medical director Kathleen Dully, the system-connected foster mother and other witnesses called by the Defendant Foster System Operators, combined with the strategically misleading presentation of certain evidence and withholding of other information. Contrary to the final judgement terminating the parents' rights, the system-connected foster parents were not licensed medical foster parents.

103.   It is not presently known if the TPR judgement was prepared for the judge's signature by DCF; that appears to have been the practice at the time; if so, to  the extent that the judgement does not accurately reflect the actual evidence at the trial, the content of the final order may itself be further additional evidence of the fraud the Defendant Foster System Operators and their lead agency perpetrated on the dependency court.

104.   There are two stages at which placement decisions are made during a dependency case: when a child is detained following a shelter petition and when the Birth Parents' rights are terminated.

105.   At both discrete times, as well as throughout the dependency case, the Defendant Foster System Operators are expected to follow the law to locate appropriate relatives. Here, at the outset of the case, the Defendant Foster System Operators showed their disregard for the law by ignoring R.W.'s relatives in August and September 2017, falsifying a report to falsely accuse the maternal grandmother of abuse, ignoring the other maternal and paternal relatives of R.W. and internally diverting the child R.W. to its own system-connected personnel, completely contrary to law.

106. The March 2018 TPR ruling ending the Birth Parents' fundamental rights to parent Lil R. and R.W. gave the Defendant Foster

System Operators another opportunity to follow the law and do things right, conducting the required diligent search to update the information as which of Lil R.'s and R.W.'s relatives who would be selected to adopt them.

107.   DCF's AARC recommended that the paternal grandparents Charlotte Williams and Rodney Williams, Sr. adopt both R.W. and Lil R. At one point, the Defendant Foster System Operators provided the paternal grandparents with the so-called "Red Folders", the folders supposedly containing all of the medical records for the children being adopted. Even thought the AARC recommendation was made after the TPR judgement, it did not contain the GeneDX lab results or any of the medical records that the Foster System Operators had compiled, but only a single GAL Program report from December with no reference to the actual then available lab results. Also missing from "Red Folder" for R.W. were the judicial review reports and all of the medical information the Foster System Operators had provided R.W.'s system-connected custodians.

108.   Sometime after the TPR judgement, the paternal grandparents were afforded an opportunity for a sibling visit between their grandson Lil R. and their granddaughter R.W. The visit took place at the lead agency office, with one of the case managers supervising. At one point the system-

connected foster mother came into the room, was told by the supervising case manager she did not need to be there, and left, and went and talked to other lead agency staff. Despite the AARC recommendation, and the Department at one point indicating its approval of the paternal grandparents as the adoptive parents for both Lil R. and R.W., the Defendant Foster System Operators apparently followed the instructions of the system-connected foster mother, because there were no other sibling visits between the paternal grandparents, Lil R. and R.W.

109.   At one point, the attorney for system -connected foster parents said they would appeal the AARC recommendation.   Instead, they convinced the Foster System Operators to do what they wanted, then collaborated on sending the message to the paternal grandparents that if grandparents tried to adopt R.W., they would not get to adopt R.W. and would lose Lil R. as well.

110.   The system-connected KFF board member and his wife declined to go along with the AARC recommendation and objected to its recommendation. With the help of KFF, they tried to block AARC recommendation that the paternal grandparents adopt R.W., and were

successful in blocking any further sibling visits, with no explanation ever given as to why the siblings were being kept apart.

111.   The paternal grandparents learned that at least one report the Foster System Operators filed with the dependency court incorrectly indicated the paternal grandparents cancelled a sibling visitation, which was not correct.

112.   Paternal grandparents Charlotte Williams and Rodney Williams, Sr. adopted Lil R. in April 2019. They should have already been promptly given all of the genetics test results relating to R.W., so they could know, in a timely fashion, what testing they should have done on Lil R., who had been with them for more than a year. The Defendant Foster System Operators never gave them the information.

113.   The paternal grandparents had requested to adopt, and were approved by the AARC, to adopt both Lil R. and R.W. [A November 7, 2018, note reflects as of that date that DCF had chosen the paternal grandparents for adoption of both children, and noted that the foster parents objected, and wanted to adopt R.W. themselves]. To get the AARC approval, the paternal grandparents had prepared their home, completed a detailed Home Study to adopt both of their grandchildren and keep them together. Their home

study indicated they were willing to adopt both of the children without receiving the adoption subsidy to which any adoptive parent is entitled.

114.   After AARC recommended that they adopt both Lil R. and R.W., with R.W.'s foster parents and their attorney indicating they objected and would keep fighting, threats were conveyed to the paternal grandparents threatening them, saying they could lose Lil R. if they did not let the foster parents adopt R.W.

115.   There were at least three attempts by the system-connected foster parents and their Foster System Operator supporters to use the dependency system to take Lil R. from his biological family, as they had with R.W., to add Lil R. to the KFF-board member foster family. In the fall  of 2018, after the TPR judgement and before Lil  R.'s adoption, lead agency KFF supported  Foster System Operators DCF and the GAL Program filed  a motion to change the placement of Lil R. to the nonrelative system-connected foster parents who had R.W.; the motion was denied over their objection, but the pressure on the paternal grandparents continued,  but  that was not the last time the Foster System Operators tried to permanently divert Lil R. from his family. Another attempt to use the system to take Lil R. occurred after his adoption in April 2019; a DCF/lead agency case worker form Clay

County attempted to remove Lil R. from his daycare without a court order or exigent circumstances, stating she was going to "take him where his sister is!", the home of the KFF-connected board member/trustee licensed foster parents. Lil R.'s adoptive father Rodney Williams, Sr. was successful in stopping the attempted taking. In October 2019, shortly after the adoption of R.W. by the system-connected nonrelatives was finalized, Defendant Foster System Operators filed a detention petition to remove Lil R. from his adoptive parents; almost immediately, the adoptive parents of R.W. and their attorney filed a motion in the 2019 case involving Lil R. in a further attempt to have Lil R. wrongly diverted to them.

116.   The efforts of the paternal grandparents were insufficient for them to adopt their granddaughter R.W.; they had paid an attorney to represent them in the adoption of both grandchildren, but they did not learn until much later, after the nonrelative system-connected foster parents had adopted R.W. that the Foster System Operators and the Lead Agency, paid money to their attorney before R.W.'s adoption in July 2019. In July a KFF board member and his wife, with the continued backing of KFF, GAL and DCF, were approved to permanently separate R.W. from her biological family and adopt her, and the adoption ruling was obtained in July 2019,

with the help and thumbs on the scale of the Defendant Foster System Operators, who stripped R.W. of her birth name, her heritage, her biological family and her culture and community.

117. After Lil R's adoption in April 2019 and R.W.'s July 2019 adoption, the Defendant Foster System Operators' filing of a dependency petition to take Lil R. from the adoptive parents went forward, with a case plan being offered. Ultimately, after further trauma to Lil R., the Adoptive Parents completed their case plan and maintained custody of their adoptive son although the concern of further Foster System attempts to achieve a diversion of Lil R. to the system-connected now-adoptive parents of R.W. continued to loom.

118. The potential for further misuse and abuse of power demonstrated by the KFF-connected adoptive parents continues. At a hearing in late 2019 in the 2019 case involving Lil R., a hearing at which R.W.'s adoptive parents and their attorney were not parties, the system-connected foster/adoptive parents nevertheless barged into the courtroom with their adoption attorney and made false and negative claims against a maternal relative of Lil R's, Tiara Crutch. By the time of that hearing the Adoptive Parents/paternal grandparents had learned of the KFF connection

of the then-adoptive father and advised their lawyer, who informed the dependency judge presiding over that hearing of the adoptive father's status as a KFF board member, with the dependency judge recognizing that was a conflict of interest.

119.   Also, during the 2019 Lil R. case, well after the TPR order entered in March 2018 and after Lil R.'s April 2019 adoption day, DCF and its lead agency KFF, and the GAL Program convinced the judge to enter an *ex parte* "no contact" restraining order against the Birth Parents, even though the Birth Parents had not been given notice or an opportunity to be heard. After obtaining the order, the Defendant Foster System Operators did not arrange for the order to be served on the Birth Parents. When the Birth Parents contacted the Clerk to try to obtain a copy of the so-called order from the Clerk's Office, they were told no restraining order could be found.

120.   In May 2020, three years and one day after R.W.'s May 2017 birthday, the Birth Parents gave birth to their third child, T.W. Apparently continuing their efforts to improperly internally divert children from their birth families to the system-connected former Board member/trustee, there was at least one attempt by the Defendant Foster System Operators to

remove T.W. from his Birth Parents, with a dependency petition filed in 2021.

121. This time, the Defendant Foster System Operators were not successful. In T.W.'s case, competent counsel were appointed to represent the Birth Parents: the Regional Counsel's Office represented the Birth Mother and conflict counsel represented the Birth Father.

122. The allegations in the dependency petition filed in February 2021 in T.W.'s case were similar enough to those in the 2017 dependency case involving Lil R. and R.W. that the dependency judge in T.W.'s case allowed the Birth Parents and their counsel in the 2021 case to access the information from the 2017 case, and to follow the trail of suggested areas of inquiry. Even though during the 2021 case the actual complete GeneDX lab test results were not able to be obtained, [they were not able to be  obtained  until February 2022], the Birth Parents' attorneys took depositions of at least one geneticist expert witness and radiologist/metabolic bone disease expert witness. In August 2021 at a pretrial hearing, after being confronted with the confirmed diagnosis of R.W. having a metabolic bone disease, after learning the experts would be allowed to testify at the then-pending dependency trial scheduled for August 2021, Defendant Foster System Operators DCF and

GAL Program agreed to voluntarily withdraw the petition in T.W.'s case before the expert witnesses could testify before the dependency judge at the then-pending trial on the dependency petition. In dismissing the petition, DCF and the GAL Program staff assured the then-presiding judge that they were satisfied that T.W. was safe with the Birth Parents and there was no need for his removal, clearly acknowledging that R.W. had a metabolic bone disease, and should not have been taken from her Birth Parents, who had been trying in August 2017 to get proper medical care for their daughter R.W. T.W. remained, and remains, in the care and custody of his Birth Parents, with no foster system supervision. This voluntary dismissal of the dependency case regarding T.W. is further evidence of the travesty that occurred in the handling of the 2017-2018 case, which should itself have been dismissed as baseless, just as happened in 2021.

123.   No action has yet been taken in the dependency case to undo the travesty that had occurred in 2018 in terminating the Birth Parents' rights to Lil R. and R.W.

124.   As to the inappropriateness of terminating parental rights in an unexplained fracture case when the child with the fractures has the LEPRE1 genetic mutation in one recessive gene, see *In the Interest of N.M, supra*

(footnotes 23,  24 and 7 on pp. 9-10 are particularly illustrative as to the inappropriateness of terminating parental  rights with LEPRE1 children). [Exhibit 4, attached].

125.  The Plaintiff Adoptive Parents of Lil R. were willing and available to assume custody of both of their grandchildren Lil R. and R.W. upon the children's removal from the parents in August 2017, after the allegations of abuse were levied against their son Rodney Williams, Jr. and his wife Taniyah Crutch-Williams, the Plaintiff Birth Parents.  The paternal grandparents, who passed an initial home study for placement of the children in September 2017 and an even more rigorous background check and home study to be approved to adopt their grandson Lil R. were thwarted and denied the adoptive placement of their granddaughter R.W., who remains separated from her Birth Family to this day. The Plaintiff paternal grandparents are still available for placement of R.W.

126.  Meanwhile, even though the Adoptive Parents of Lil R. should have the same right of access to the 2017 file as the Adoptive Parents of R.W., the Defendant Foster System Operators [including DCF, the GAL and R.W.'s adoptive parents and their attorney are fighting "tooth and nail", [words of R.W.'s adoptive parents' attorney] to keep Lil R.'s adoptive parents from

having access to the docket and the documents filed in the case file. At a hearing earlier this year, the Foster System Operators, R.W.'s Adoptive Parents and their attorney successfully argued to the dependency court that Lil R.'s adoptive mother Charlotte Williams could not be present in the courtroom at a hearing on a motion for continuance or for other motions in the 2017 case   relating to   both Lil R. and R.W., because the case had supposedly been declared "a closed proceeding" to which Lil R.'s adoptive parents were not welcome.   It does not appear Lil R.'s adoptive parents Charlotte Williams and Rodney Williams, Sr. were given notice of any motion and hearing at which the "closed hearing" status was determined or their exclusion from the case was determined and from Lil R.'s case were considered, despite her adoptive son Lil R. being a full party. Certainly, their due process rights and the statute [Fla. Stat. § 39.0132] regarding the right of children and their legal guardians to dependency case files clearly support their right to notice and an opportunity to be heard.  It also appears that the GAL Program continued to unlawfully participate in the 2017 dependency case of Lil R. and R.W. after the entry of an order discharging them in April 2019: clarification has been requested from Defendant Foster System Operators, but no documentation has been provided.

WHEREFORE the Williams Family Plaintiffs request the following relief:

a.    A preliminary and permanent injunction against Defendants and its directors, officers, agents, employees and representatives and in and all persons acting in concert with them from engaging in each of the unlawful practices set forth herein;

b.    A declaratory judgement that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. 1988;

c.    The entry of an order assessing their costs and reasonable attorney's fees against the Defendants pursuant to 42. U.S. C. § 1988;

d.    Such further relief as the Court deems appropriate.

### B.    <u>Second Count  -The Rogers Family</u>

127. Rogers Family Plaintiffs reallege paragraphs 1 through 17, 25 through 29, and 42 through 53 and further allege.

128.  David and Charlotte Rogers and their daughter Alexandra (pseudonyms) are residents of North Carolina.

129.  Prior to 2017, the Rogers Plaintiffs adopted infant Alexandra, shortly after her DeSoto County, Florida birth, and let the adoption officials know of their willingness to adopt any siblings of Alexandra.

130.   Florida is one of at least forty-nine (49) states which had adopted the UCCJEA, Fla. Stat. §§ 61.501 through 61.542 [Massachusetts is apparently still considering adoption of the Act], the Uniform Act that provides for protection of due process rights to notice and an opportunity to be heard on questions of placement and custody of children, as well as visitation.

131.   Every dependency case in Florida is subject to the UCCJEA, with the dependency court with a pending dependency case having exclusive jurisdiction over the foster child.

132.   When Alexandra's little brother M.S. was born in May 2017 and, a few days later was taken into foster care in DeSoto County, Defendant DCF [and its contracted lead agency Safe Children Coalition [SCC]] had a duty to comply with the UCCJEA and give the Rogers Parents prompt notice of the occurrence.

133.   The Defendant Foster System Operators also had a duty to conduct a diligent search for relatives of M.S., which by law, included the Rogers Parents. Fla. Admin. Code §65C-16.002(3) (a regulation adopted by DCF itself) specifically required the notification of adoptive parents of siblings of the sheltered child.

134.   DCF [including its contracted lead agency Safe Children Coalition (SCC)], the CPT and GAL Program had a duty to give prompt notice to the Rogers family and to arrange for the placement of M.S. with them, both on a temporary and permanent basis.

135.   Instead, they delayed the notification, choosing to take M.S. and divert him to system-connected foster parents, illegally, completely ignoring the legal requirements of Florida law, and the best interests of M.S. to be with his sister Alexandra in the Rogers home.

136.   The nonrelative system-connected foster parents to whom the Defendant Foster System Operators diverted Alexandra's brother included a couple with many connections to the foster system and no relation to M.S. or any relative of his. Both had served as foster parents of many nonrelative foster children. They had served as group home parents for the system. The foster mother also served as a volunteer for the GAL Program, and the foster father, a licensed clinical mental health provider, performed Comprehensive Behavioral Health Assessments ("CBHA's") for many foster children in lead agency Safe Children Coalition [SCC]'s catchment area, and had apparently been under contract with the lead agency at some point.

137.   As with the other families, Defendant Foster System Operators had the obligation to place M.S. with relatives promptly at two separate times during the dependency process: when M.S. was detained at the 2017 shelter hearing and in 2018 when parental rights were terminated. By the terms of DCF's own administrative regulations relating to the importance of making sure siblings were placed together, including Fla. Admin. Code § 65C-16.002, the Foster System Operators were obligated to promptly and immediately give notice to the Rogers in North Carolina, as the adoptive parents of Alexandra, treating the adult adoptive parents of Alexandra as relatives. Instead, they chose to select the nonrelative system-connected foster parents initially, and to ignore the Rogers Family for several months. After making contact with the Rogers family in early 2018, Foster System Operators told the Rogers Family they would get the interstate compact paperwork in process, submitting the motion for the I.C.P.C. home study and having the dependency court sign the order directing the home, study, then chose not to ever submit the paperwork through channels in Tallahassee to the DCF staff who handle coordinating the needed home study with their counterparts in other states, in this case North Carolina.

138.   Eight months after M.S.'s being sheltered DCF finally notified the Rogers, the Rogers Plaintiffs immediately notified DCF and SCC of their interest in having M.S. placed with his sister Alexandra.   The Rogers Plaintiffs. located the Birth Mother whose parental rights were still intact, and she. voluntarily provided her signed consent for M.S. to be adopted and raised with Alexandra.

139.   When the Rogers Parents finally received notification of the existence of M.S. some eight months later, DCF and the GAL did everything they could to block access to the dependency case, keeping them from participating in the UCCJEA hearing required for the temporary and permanent placement and custody issues.

140.   The Rogers Plaintiffs, through their adoption entity as specified by law, moved for custody of M.S. in the dependency case, asking the court to placed M.S. in their custody, to no avail, as DCF, SCC, and the GAL all opposed placing M.S. with his biological sister in direct contravention of the mandates of  the Adoption and Safe Families Act [ASFA], the Family First Prevention Services  Act [FFPS], Chapter 39 and the Florida Administrative Code.

141.   DCF, SCC and GAL also failed to institute and maintain the required visitation plan between the full-blooded siblings, ignored the Rogers' continued requests for visitation and placement while supporting placement with system-connected persons they were assisting, while DCF and GAL continued to ignore the legal provisions that entitled the Rogers to participation at hearings relating to temporary and permanent placement, custody and visitation, and other provisions of state and federal law, as well as the constitutional rights of the Rogers and daughter Alexandra.

142.   At all times material, the nonrelative foster parents for M.S. had multiple connections to the foster system and were the nonrelative persons selected by the Defendant foster system operators to raise M.S., contrary to law.

143.   When a judgement terminating the rights of the Birth Parents of M.S., Defendant Foster System Operators had still not obtained the court-ordered home study of the Rogers Family, although the Rogers Family had, at their own expense, had provided an appropriate complete home study report.

144.   As of the time parental rights to M.S. were terminated, the Defendant Foster System Operators continued to ignore the children's rights

to be together, and their rights to have visits until placement together could occur; instead, they continued to completely ignore law, including the mandatory hearing provisions of the UCCJEA, and the due process rights of the Rogers Family, and of M.S., to notice and a meaningful chance to be heard.

145.    Again, as with the other families here, Defendant Foster System Operators ignored the rights of the children, and the federal and state law and the Florida legislative findings that children who could not be returned to their birth parents have better outcomes when placed with relatives, rather than nonrelative system-connected staff, essentially acting against the best interests of M.S. and his sister Alexandra.

146.    In 2019, the Rogers Plaintiffs hired an attorney who filed a notice of appearance and requested discovery. Mysteriously, with no notice or opportunity for the Rogers Plaintiffs or their attorney to be heard, the dependency court entered an ex parte order striking the legal papers filed by the Rogers' attorney Andrew Chiang.

147.    Thereafter the Rogers retained different attorneys, who filed a motion for visitation in 2020 and finally, on August 6, 2020, were given hearing time on August 19, 2020, for the motion to require visitation between

Alexandra and her brother, M.S.; a hearing was needed because the foster parents, shielded by DCF, SCC and the GAL, flatly refused to allow contact between the siblings.

148.  The day after the Plaintiff Rogers e-filed  their notice setting the visitation motion for hearing on the August  19, 2020 hearing date they had been given by court staff,   the Rogers' counsel received a 7-page order granting a  joint motion submitted by DCF  and GAL [not served on the Rogers or their attorneys],  denying the motion for visitation, striking the notice of appearance and ordering counsel not to provide a copy of the order to anyone.

149.  Through counsel, the Rogers and Alexandra filed a notice of appeal, and sent a public records request to DCF, GAL and the Trial Court Administrator of the Circuit, seeking any ex parte emails sent by DCF or GAL regarding any joint motion or proposed order.

150.  Contrary to Florida law, DCF and GAL responded that the Rogers were not entitled to any documents; the Trial Court Administrator followed the law provided the Rogers   a set of emails from DCF and the GAL to the Judicial Assistant for Judge Hall with some redactions.

151.   The Trial Court Administrator's packet contained two sets of emails. The first set showed that DCF and the GAL had arranged a secret, ex parte hearing in December 2019 on a secret DCF/GAL joint motion to strike the papers filed by Rogers' attorney Chiang.  Another email reflected DCF's, and the GAL's ex parte transmittal of a secret proposed order sent to the presiding dependency Judge Hall after the hearing; Judge Hall entered the order DCF and GAL provided ex parte, with the order not provided to the Rogers Plaintiffs and then-attorney Chiang for several weeks.

152.   The email packet also contained an August 6, 2020, transmittal email [Exhibit 5] from DCF and GAL to Judge Hall of a copy of a DCF and GAL joint motion to strike all of the papers pertinent to the August 19 hearing on the motion for visitation between the two children. The email reflects that the joint motion had not been served on the Rogers Plaintiffs and their attorneys. The email also reflected that a proposed order, was being sent with the secret email and secret, unserved motion.

153.   During the months following their learning of Alexandra's brother and seeing the roadblocks DCF and GAL placed in their efforts to participate in the dependency court proceedings, the Rogers communicated with the Office of the Governor, and the Inspector General, about the law

violations that were occurring and keeping the two biological children apart, contrary to law. The communications resulted in the inquiries and complaints being referred to the Suncoast Region Office of the Regional DCF personnel and accomplished nothing for the two children or the Rogers Plaintiffs, other than to enhance the delays interposed between the Rogers Plaintiffs and the court system.

154.   As of the time of the July 2020 motion for visitation, set to be heard on August 19, 2020, the two siblings had only seen each other one time in person, in September 2019. Since September 2019, there have been no other in person visits, and only one short zoom call [in December 2020] between the then 5-year-old Alexandra and then 3-year-old M.S.

155.   While Alexandra's appeal of  the August 7, 2020 order was pending at the Second District Court of  Appeal, with DCF and the GAL participating, and aggressively pursuing every opportunity to end the appeal on the one hand, and delay any ruling on the other hand by various motions to strike, while being fully aware of their violation of the UCCJEA laws, and their denial of the due process rights of the Rogers Family, DCF and GAL encouraged the foster parents to proceed with not only the dependency case, but the adoption of M.S. hoping to thwart the judicial

branch ruling, additionally continuing to  block the dependency and adoption judges from considering the visitation issue.

156.   The Rogers still have not had the requisite visitation hearings and have moved to intervene in the adoption case to preserve their and Alexandra's rights under law, rights which the foster system Defendants seem intent on ignoring.

157.   The 2020 appeal resulted in an October 2021 reversal of Judge Hall's order. Both DCF and GAL moved   for rehearing, clarification, and certification. After denying the motions for rehearing and certification, the District Court of Appeal issued its mandate on April 21, 2022 [copy attached as Exhibit 6] with Judge Hall's order reversed, and directing that Alexandra be given a hearing, as specified in the opinion, reversing the August 7, 2020, order entered nearly two years ago.

158.   The hearing mandated by the Second District Court of Appeal has not yet been scheduled.

WHEREFORE Plaintiffs demand judgement against Defendants and prays for the following relief:

a.      A preliminary and permanent injunction against Defendants and its directors, officers, agents, employees and representatives and in and all persons acting in concert with them from engaging in each of the unlawful practices set forth herein;

b.      A declaratory judgement that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. 1988;

c.      The entry of an order assessing their costs and reasonable attorney's fees against the Defendants pursuant to 42. U.S.C. § 1988;

d.      Such further relief as  the Court deems appropriate.

### C.  Third Count - The Mitchell Family

159.   The Mitchell Plaintiffs reallege Paragraphs 1 through 17, 30 through 35 and 42 through 53, and further allege:

160.   Initially, prior to the TPR judgement entered in October 2016, Defendant Foster System Operators DCF [including its lead agency SCC and the case management agency Youth and Family Alternatives [YFA]] and Defendant GAL Program handled the sheltering of Regan  and her half sister Chelsea D correctly, making sure that the two sisters were kept together when placed with relatives, their great aunt April Maxwell and her partner Marcus

Diamond and their cousins Everett M and Hilarie M. who were like siblings to them. (all names under this Mitchelle section are pseudonyms)

161.   Chelsea D. was in the Maxwell Diamond home from March 2015 through December 2015, when she was placed with her father and his then-fiancée/ later wife, the DaCostas.

162.   Regan was in medical foster care for the first five months of her life until her weight and other issues stabilized, then, with the support of the GAL program, moved to the Maxwell /Diamond home.   Regan's dependency case was overseen and managed by SCC [the same lead agency responsible for case management duties for Alexandra R] and its subcontracted case management agency YFA.  The child Regan resided in this placement with her sister Chelsea D., two cousins Everett and Hilarie M., and was later joined by her then twelve-year old maternal aunt, Karla M. who was placed in the home by DCF after Karla's shelter following her mother's death.  While in this placement the child Regan maintained contact with her sister Chelsea in Massachusetts and Chelsea's parent and guardian, in addition to other relatives.

163.   Regan  was in the Maxwell/Diamond family home from September 2015 until October 2017. Another minor, Karla M., Regan's aunt  but whose relationship was more like that of a sibling,   joined the family in the

Maxwell/Diamond home in June 2016 after Karla's mother died; Karla's father Regan's placement in the Maxwell/Diamond home to be permanent; April Maxwell and Marcus Diamond had been together for more than 15 years, parenting April's children Everett and Hilarie M. during that time and parenting the other youngsters as they were added to the home.

164.   While in this placement Regan maintained contact with various of her biological relatives in Florida and elsewhere, while she continued in the relative care placement appropriate under state and federal law.

165.   After the TPR judgement ending the parental rights of Regan's Birth Parents, however, when the Defendant Foster System Operators transferred Regan's case to the adoption unit, things changed, as staff in that unit began to work to divert Regan away from biological relatives to a nonrelative system-connected behavioral health specialist of lead agency SCC who had learned she and her husband could not have children.

166.   The workers in the adoption unit, with the assistance of DCF attorneys, arranged to obtain an order that required Marcus Diamond to leave the family home and all of the youngsters, until Regan was out of the home, essentially trying to cause Ms. Maxwell to feel like she had to choose between continuing to parent her great niece on the one hand, and her fiancé/ the father

figure of the youngsters on the other. The conduct relied upon to justify the no contact order was not recent conduct but involved an event that had occurred before Regan was even moved into the Maxwell home in September 2015.

167.   The YFA team, while telling Ms. Maxwell that Mr. Diamond was not allowed to come to the hearing, provided false information to the dependency judge as to why there should be a no contact order, misrepresenting that he posed a risk of harm to the children, wanting to put maximum psychological pressure on Ms. Maxwell to choose to have Mr. Diamond in the home rather than continuing to provide the stability in which Regan had thrived, in which the Maxwell children had thrived for more than ten years, and in which, at that point, Karla had thrived since being placed in the home in June 2016. In short, Defendant Foster System Operators essentially smashed an intact family to set up the internal diversion of Regan to the SCC nonrelative system-connected specialist. Stated differently, there was no reason for Regan to be removed from the Maxwell home, the adults in which had cleared the home study process years earlier, and the Foster System Operators required by law to help children and their families instead abused their power and acted contrary to law, to set up the kidnapping, the internal diversion of Regan to the system-connected specialist.

168.  With the help of DCF attorneys, and in reliance on misleading and out of context information, System-connected operators convinced the judge that the home was not safe for Regan. They chose not to tell the judge about the two Maxwell children in the home or that there was another foster child in the home. They withheld from the court that there was no risk to  the safety of Regan,  and, as importantly, they chose not to tell the judge DCAF, SCC and YFA staff were implementing their plan to internally divert Regan to the SCC employee who wanted to adopt the child, that this was a clear conflict of interest, and that the system was abusing its power to help nonrelatives rather than complying with the federal and state laws favoring relatives over nonrelatives, because of the fact that children placed with relatives achieve better outcomes than those with nonrelative foster system-connected employees.

169.  At a hearing in early October 2017, mindful of the obligation to put children with relatives, rather than nonrelative strangers, the judge ordered Regan's placement changed to the home of a different great aunt, Dale and Slade Felton and their two children, Jaclyn and Laurel F. [Dale Felton, April Maxwell and the grandfather Pedro Morgan are siblings, and Regan was already familiar with the other family members, who lived nearby].

170.   In response to that placement, DCF and YFA came up with a negative home study of the Felton's, and misrepresented the significance to the court of a minor drug possession offense from several years earlier, telling the judge it was completely disqualifying, even though that was not correct and even though one of the matters over which the AARC had jurisdiction was to assess risk related to home studies [See Exhibit 1 relating to AARC]. At that hearing, DCF and YFA again withheld from the dependency judge that they did not plan to conduct the diligent search that was required, to see what other relatives there were for Regan, and they did not tell the judge they were planning to get the child improperly to the system-connected SCC employee, where the outcome would likely not be as good as it would be if Regan continued with her relatives.

171.   Unaware of what DCAF and its subcontracted case management staff were orchestrating, the judge ordered then two-year-old Regan taken from her family and relatives and returned to foster care, meaning that the child had to be in the legal custody of licensed foster parents, as the system-connected case managers and DCF knew. DCF personnel ignored the laws requiring visitation for Regan with the relatives from whom DCAF and its personnel were taking her, and blocked the relatives from any further contact, telling them

they would never see the child again, that they had identified adoptive parents for her, and they should consider her gone.

172.   When Massachusetts-based Plaintiff Mitchell learned of Regan's return to foster care for purpose of being adopted by a nonrelative, she promptly reached out to DCF and the lead agency to notify them of her intent to have Regan placed with her; at that time, no one had told the family that the system was doing what it was doing to arrange for Regan to be put with a nonrelative system-connected employee of the lead agency who wanted Regan for herself, and no one told the family that what the system was doing was unlawful, and that information was being intentionally withheld from the dependency judge to accomplish the taking of the child.

173.   Plaintiff Mitchell made numerous contacts with DCF and its contracted lead agency and case management agency, while the foster system connected personnel kept Regan illegally in the nonrelative non-licensed foster home of the system connected specialist. None of the persons with whom Plaintiff Mitchell spoke told her of the foster system operator plan for Regan to be separated from family so she could be taken by a lead agency official, and no one disclosed during these several initial months that Regan's placement in the employee's home was unlawful, and contrary to the court order requiring

Regan to be in a licensed foster home, which the home of the lead agency's employee was not.

174. A home study of Plaintiff Mitchell was initiated; no family members were allowed to contact Regan. Several months after the unlawful taking and placement of Regan with nonrelative  system-connected non-foster parent, around the time when Plaintiff Mitchell was having trouble arranging even for a supervised visit with Regan, she learned that the Foster System Operators had selected a nonrelative non-foster parent to  take Regan,  and learned that the selected person directly employed by lead agency, and was not a licensed foster parent whose initial "custody" of Regan was unlawful. Still Plaintiff Mitchell had trouble arranging for visitations with Regan, even after her home study had been approved. During the time Plaintiff Mitchell came forward after learning the system had wrongly taken Regan from the Maxwells and Feltons, before Plaintiff Mitchell's home study was approved, Florida relative – Regan's great, great aunt Kathy Gomez could have provided temporary relative care, rather than Regan being with non-foster parents who were not relatives and who had Regan put with them against state and federal law and the dependency judge's order.

175.   Even after Plaintiff Mitchell's home study was approved, and she began to have visits with Regan, first in Florida, later in Massachusetts, Regan's custody was not changed to Plaintiff Mitchell. DCF and its operatives [including the Child Network of Southwest Florida which took over case management after the blatant conflict of interest between the nonrelative non-foster parent custodians and the SCC/YFA came to light] continued to allow the nonrelative, non-foster parents to have custody, and continued to allow them to control and limit Regan's visits with Plaintiff Mitchell.

176.   Plaintiff Mitchell applied, passed a home study on an expedited basis and was approved to adopt Regan, however DCF and its lead agency SCC continued to keep their thumbs on the scale in support of the improper, unlawful placement with the SCC employee and her husband who had snatched the child with the assistance of those at SCC and DCF who ignored state and federal laws.

177.   When the judge ordered Regan taken from relatives and returned to foster care, that order meant that the child was in the legal custody of the state. That order indicated that Regan could only be in the physical custody of licensed foster parents, as the system-connected case managers and DCF knew. The Defendant Foster System Operators knew that even an overnight visit

outside a licensed foster home would violate Florida and federal law, and the dependency judge's order, yet ignored the law, and left Regan in the unlicensed, nonrelative non-foster home of the system-connected employee.

178.   At neither of the October 2017 hearings did DCF attorneys or the YFA case managers tell the judge the truth, that Marcus Diamond posed no safety risk to Regan or any other child in the home, that there had been a misunderstanding on the part of Mr. Diamond's probation officer about the result of the family moving to Marion County from Manatee County. Similarly, they did not tell the judge that any problem with the probation officer about an alleged lack of notice about the move had been remedied with the probation being revoked and Mr. Diamond serving the jail time to which he had been sentenced, nor did they disclose that the sentence had been fully served before even the earliest of the October hearings removing Regan from the Maxwell home and relatives.

179.   When the second October 2017 hearing was over, YFA personnel gleefully  bragged about  getting Regan out of relative care,   telling the Felton and Maxwell great aunts they would never see Regan again, the adoption was already lined up; that statement, while true in hindsight, is evidence of the planned stealing of Regan from her relatives  to  be permanently placed with

the lead agency's employee, contrary to the very federal and state laws the Foster System Operators were in charge of compelling compliance with.

180.  The day after the hearing, after learning from her brother-in-law Pedro Morgan that Regan was back in foster care, maternal great aunt Kendall Mitchell tried to reach foster system officials to obtain custody of her great niece, her sister's granddaughter.

181.  First, a DCF employee gave misinformation about the lead agency, and the number she should call. When she persisted, and finally reached the YFA adoption unit supervisor, and told the supervisor she would like custody, the supervisor  told  her essentially it would never happen, that little two year old Regan was already bonded  with the selected adoptive family [this statement was untrue, the SCC employee and her husband had not even met the child], that it would take a long time to satisfy DCF authorities responsible for  interstate compact home studies [another untrue statement]. Finally, supervisor Lidia Casanova told Kendall Mitchell regardless of what Mitchell did, by the time the case was decided, no judge would stop it.

182.  On or about October 27, 2017, AFTER foster system officials knew about the availability of great aunt Mitchell, they moved Regan into the nonrelative home of the lead agency employee and her husband, neither of

whom had ever been a foster parent, and neither of whom had ever taken the required training to become a foster parent., who simply were not licensed foster parents; SCC, YFA and DCF knew the placement was unlawful, contrary to the court's order placing the child into foster care [by law, Regan child could not be removed from the licensed foster home in which she had been placed, absent a proper evidentiary hearing with proper notice and a further order allowing the child to be placed with the nonrelative/ non-licensed lead agency employee, essentially stealing the child, contrary to chapter 787, and federal and state foster system laws.

183.   DCF and its case managers withheld from the dependency court and Great Aunt Mitchell information about the violation of the court's order and withheld that the selection of the SCC employee to adopt the child violated the laws in numerous ways.

184.   Defendant Foster System Operators also withheld from the court the existence of maternal great, great aunt Kathy Gomez, who was ready, willing, and able to provide lawful relative care for Regan M while the Defendants completed the Interstate Compact process of getting great aunt Mitchell's home study approved.

185.   DCF and its foster system operators allowed the snatching of Regan to stand, even after the dependency judge and Great Aunt Mitchell  learned of the inexcusable, improper conflict of  interest and placing the self interest of system-connected workers ahead of the legal rights [under state and federal laws] for the child to  be with relatives, and placing the desires of  the lead agency's employee ahead of the best interest of Regan, which required her to be with relatives, not nonrelatives.

186.   Commendably, throughout this case, the GAL supported the efforts of Great Aunt Mitchell to gain custody of Regan. In May 2018 the AARC – after hearing evidence – recommended that Ms. Mitchell be the one to adopt Regan. Even at that point, however, DCF did not move to change Regan's placement from the interloping child snatchers, but left Regan with the SCC employee and her husband who restricted attempted visits and placement change requests of the Great Aunt.

187.   During the more than a year Great Aunt Mitchell fought the system, believing the laws would be followed, she was not appointed an attorney; the Foster System Operators opposed her being given party status, she was not given any official status to participate in the case, and, as a technical nonparty had no right to file papers in the case.  Ms. Mitchell made several trips from

Massachusetts to Florida to visit with the child, to bond with her, but was frustrated by last-minute cancellations of visits by the nonrelative custodians favored by the Foster System Operators.

188.   Like so many others, Plaintiff Mitchell had reached out early on in the process to  the Governor's Office and the Office of  the Inspector General to point out how wrong it was, for foster system officials not to follow the law to place Regan with relatives, of which there were [and are]  many; the Governor's Office and the Office of the Inspector General referred the matter to  the DCF Suncoast Regional  headquarters office in Hillsborough County.

189.   In September 2018, DCF agreed with the SCC employee there could be a "do -over" on the AARC hearing process that had resulted in the recommendation that Plaintiff Mitchell be allowed to adopt Regan, all the while the lead agency and DCF were not following the laws, despite all knowing that it was in Regan's best interest to be with relatives.

190.   After not responding to Great Aunt Mitchell's contact with the Governor's Office and to the Inspector General for several months, with the delays working against Regan's best interests, DCF Regional personnel responded in the fall, trying to justify the foster system operators' unlawful activities, making false statements.

191.   By December 2018,  Plaintiff Mitchell was still being kept in the hallway outside hearings, while others, including SCC leadership  and attorneys were allowed into  the courtroom, and the system-connected custodians were allowed inside, with system- connected officials insisting that the byzantine juvenile procedure rule and statutory definition of "party" and "participant"  were properly used to trample Plaintiff McGinty's due process rights to be present and heard  as a  participant  who had the same rights as the Rogers family under the Florida UCCJEA regarding any custody or placement hearings.

192.   By late December 2018/early 2019, Plaintiff Mitchell was seeing signs of stress on Regan from the alienating comments the custodians were subjecting the child to, and realized she was no match for those who had taken Regan and the foster system operators who had aided and abetted them in removing Regan from being with relatives. When the foster system operators got the AARC "do over" to conclude with a recommendation in favor of the child snatchers, Plaintiff Mitchell agreed to waive her adoptive requests and agree to specified visits and contacts she would have with Regan going forward.

193.   At all times, Regan had many other biological relatives ready, willing and able to care for Regan, including some in Florida, some in Massachusetts and elsewhere, who were ignored - contrary to law – by the Governor's minions, despite being aware that children not able to be returned to Birth Parents do better when placed with relatives.

194.   At no time did the foster system operators ever schedule the hearing that Regan's grandfather Pedro Morgan was entitled to regarding visitation, with no attempt by the foster system operators to comply with the laws.

WHEREFORE Plaintiffs demand judgement against Defendants and prays for the following relief:

a.      A preliminary and permanent injunction against Defendants and its directors, officers, agents, employees and representatives and in and all persons acting in concert with them from engaging in each of the unlawful practices set forth herein;

b.      A declaratory judgement that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. 1988;

c.      The entry of an order assessing their costs and reasonable attorney's fees against the Defendants pursuant to 42. U. S. C. § 1988;

d.     Such further relief as the Court deems appropriate.

## D. **Fourth Count     The Budlove Family**

195.   The Budlove Plaintiffs reallege Paragraphs 1 through 17, and 36 through 53, and further allege:

196.   When DCF [and the lead and case management agencies for Pasco County, Eckerd Connects [Eckerd] and Youth and Family Alternatives [YFA]] and the CPT and the GAL decided to remove T.B. from the then-still married Birth Parents, the Birth Mother provided the names of maternal relatives who would be suitable caregivers for T.B.  She also provided the name of a short-term placement with a non-relative who is system connected person, a former Alabama social worker, who was a former foster youth.  The nonrelative is also a licensed foster parent in the local foster care system.

197.   The maternal grandmother, a retired business owner in the state of Illinois, upon learning of the removal of her grandchild T.B. from the custody of her daughter, relocated from Illinois to the state of Florida.  The maternal grandmother chose an appropriate home and requested a home study for placement of her granddaughter.  The maternal grandmother, while having an approved home study, was excluded by the presiding court, based on

information provided by the assigned case managers, who were actively thwarting the mother's attempts to have her child placed with relatives, that the child could not be placed with her maternal grandmother because her "bond" with her daughter was "too close."   The fictional checklist denying placement with T.B. was never reconsidered throughout the duration of the case.  The child continued in the placement with the non-relatives who were now acting in concert with the foster care system agents.

198.   The mother then offered her maternal cousin as a relative placement.   The cousin, Mrs. Simone Wilson and her husband reside in Chicago, Illinois and were willing to receive T.B. in their home for purposes of adoption.

199.   During the diligent search phase pre-TPR, DCF, its lead agency and GAL prepared a false report regarding relative Simone Wilson, making it appear she was not qualified, despite the fact she was, and is, an accredited professional, currently working as a licensed therapist in the foster care system in the state of Illinois.  The disqualifying information was not factually accurate; they provided no opportunity for the erroneous information to be corrected, and did not want to correct it, because they wanted their favored nonrelative

system-connected caregivers to maintain custody of T.B., despite the state and federal laws to the contrary.

200.   Although the Foster System Operators were obligated to conduct a diligent search for relatives, they instead told the Birth Parents' relatives the proceedings were closed, and they were not allowed access to the proceedings, and never updated any of the relatives.

201.   The case management agency on another occasion after advising the proceedings were closed, told the relatives who contacted the case managers that if they wanted to be involved, they needed to get attorneys and ask for participant status, but again denied updates. The maternal relatives who reached out included Dr.  Richard Nunley, Felicia Nunley, Gregory Nunley, Chauntina Kern, Kiesha Kern, Danielle Nunley, Judy Miller, and Simone Wilson.

202.   During the case, the Birth Mother, like the Plaintiffs in the other cases, made complaints to DCF's Inspector General's Office about unlawful actions that were occurring, to no avail.

203.   Prior to the termination of parental rights, the Plaintiff Birth Mother requested that T.B. be placed with her biological relatives [as required by law] and moved for placement of the child with the maternal grandmother, which

the Defendant Foster System Operators blocked unlawfully and without justification so they could internally divert T.B. to the nonrelative system-connected person of their choice.

204.   The Birth Mother filed another motion for change of placement to another maternal relative Simone Wilson during the course of the termination of the parental rights proceeding after Ms. Wilson's home study was approved via ICPC.   On September 23, 2020, during the course of the pending trial for termination of parental rights, a hearing on the Birth Mother's motion to change T.B.'s placement to the relative was conducted.   The motion was denied based on inaccurate and erroneous statements in the home study, as evident by the fact that, at the time of the denied motion Ms. Wilson was a fully credentialed child therapist for the foster care system in the state of Illinois, in good standing. The nonrelative licensed foster person and spouse to whom the Defendant Foster System Operators gave T.B. are system-connected.

205.   The Birth Parents divorced on February 12, 2021, and no longer have contact.

206.   Even though at least four of T.B.'s maternal relatives initially received approved home studies, and even though the Plaintiff Birth Mother was not alleged to have abused T.B., the Defendant Foster System Operators

continue to ignore the law and do everything they can to keep T.B. with the system-connected nonrelatives, rather than following the law and placing T.B. with available maternal relatives.

207.   The pre-TPR lawbreaking by DCF and the GAL continued after the Birth Parents' Rights were terminated; notwithstanding the continuing requirement for them to locate biological relatives, and place T.B. with them, DCF and GAL continued to ignore the law and their duty to pursue family finding efforts until they were successful in   locating suitable biological relatives;  they continued to give misinformation to, and to ignore, the relatives who came forward, continuing their child snatching efforts even though by law, those efforts are not in T.B.'s best interest.

208.   Birth Mother Budlove, because of her opposition to the unlawful actions of the foster care system, has been the continued victim of ongoing actions and harassment by caseworkers and the nonrelative system-connected custodians, and the dependency court judges from whom the Defendant Foster System Operators kept pertinent accurate information and to whom Defendant Foster System Operators gave misinformation about the qualifications of maternal relatives and the requirements of the law. In the process, T.B. has been wrongfully removed and diverted from her relatives through inappropriate

injunctions and wrongful actions in ignoring the Birth Mother's First Amendment Free Speech rights, even improperly accusing her of cyberstalking in her efforts to bring public attention to the unlawful taking and internal diversion of T.B. to system connected nonrelatives.

WHEREFORE the Budlove Plaintiffs demand judgement against Defendants and prays for the following relief:

a. A preliminary and permanent injunction against Defendants and its directors, officers, agents, employees and representatives and in and all persons acting in concert with them from engaging in each of the unlawful practices set forth herein;

b. A declaratory judgement that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. 1988;

c. The entry of an order assessing their costs and reasonable attorney's fees against the Defendants pursuant to 42. U. S. C. § 1988;

d. Such further relief as the Court deems appropriate.

## VI.  FIRST CLAIM FOR RELIEF: SUBSTANTIVE DUE PROCESS

209.  Each Plaintiff Family realleges their respective allegations and further allege:

210.   The Foster System Defendants have denied Plaintiffs' right to substantive due process by, *inter alia:*

a. Misusing the Florida foster system to kidnap, snatch or internally divert Florida's children from their biological families, then wrongly trying to conceal what they have done;

b. Misusing the Florida foster system to improperly violate chapter 787 and similar federal statutes to interfere with constitutionally protected First Amendment associational rights between Birth Parents and their children;

c. Ignoring the federal and state law mandatory prioritization of Family placements, and misusing foster system powers to steal, snatch, kidnap and internally divert children from their Families to non-related strangers connected to the foster system;

d. Using a variety of prohibited and improper actions to accomplish the diversion of children, including, withholding pertinent information from the dependency judge, the Birth Parents, and their attorney; and presenting perjured testimony not consistent with facts known to the Defendant foster system operators.

e.  Ignoring the public's  and Families' rights to know about the foster system,  and  ignoring  public  record  requests,  using  whatever actions they can think of to accomplish the taking and diversion of children  from  Families,  then  withholding  actual  facts  and  the methods  used  to  accomplish  their  ulterior  motives  of  child snatching,  then  when  Families  finally  figure  out  how  the  Foster System Operators misinformed the judges and the Families about pertinent facts and the laws being violated, claiming that actions to remedy the wrongs are  too  late, and cannot  be fixed.

211.   As a result of the substantive due process violations, the Plaintiff Families are entitled to the declaratory and injunctive relief requested.

## VII.  <u>SECOND CLAIM FOR RELIEF: PROCEDURAL DUE PROCESS</u>

212.   The Plaintiff Families reallege their prior respective allegations and allege:

213.   The Defendant Foster System Operators completely ignore the rights of persons to be notified of hearings relating to custody and temporary

and permanent placements of children in the foster system as required by the Uniform Child Custody Jurisdiction Enforcement Act.

214.   The Defendant Foster System Operators do not like the courts, do not see, or treat the judicial branch as equal, and treat the judges, and their efforts to enforce   the dependency laws, with disdain, proffering perjured, incomplete and inaccurate testimony, ignoring the laws, all the while violating the due process rights of the Plaintiff Families to proper notice and an appropriate opportunity to be heard in proceedings against Defendant Foster System Operators who act in compliance with the laws.

215.   The Defendant Foster System Operators use the lack of adequate education of judges in the dependency system to their advantage, bullying the dependency judges into giving those who raise questions a sufficiently hard time that most find it easier to do whatever the Defendant Foster System Operators want done, without the judges realizing they are not being given accurate information regarding the law or the facts, and without the judges realizing how they are wrongly and improperly assisting the unlawful internal diversion of children from relatives to system-connected nonrelatives.

216.   The Defendant Foster System Operators misstate the law, shift to the Birth Parents the task of proving their innocence, ignoring settled U.S.

Supreme Court precedent in *Santosky v. Kramer, supra* which requires the Foster System Operators to meet their burden of proving by clear and convincing evidence what it is that Birth Parents did wrong to cause harm to their children.

217. The Defendant Foster System Operators wrongly withhold potentially exculpatory evidence from the presiding dependency court judges, and the Birth Families, contrary to *Brady, supra* to improperly convince the judges to rule against the Birth Parents and terminate their fundamental rights to parent their children, and the familial associational rights of all family members.

218. Defendant Foster System Operators also engage in secret communications with judges, using emails sent secretly, not copied to Birth Parents, or relatives or their attorneys, dealing with substantive issues, or transmitting secret motions and proposed orders, forwarded through the judge's judicial assistant, completely denying procedural due process requirements of reasonable notice and an opportunity to be heard.

219. Defendant Foster System Operators improperly use the statutory and rule definitions of parties and participants, to keep relatives [including siblings and their legal guardians] from participating in post-TPR proceedings relating to permanent placement, even though federal and Florida law

recognize that children not able to be returned to their Birth Parents do better overall when they are raised with family, and not strangers, and even though the UCCJEA is a law in Florida.

220.   Defendant Foster System Operators wrongly ignore their obligations to proactively and diligently search for family to serve as temporary and permanent caregivers for their relative minor children, instead ignoring their duties to find safe, suitable, willing Relatives, then arguing later that children have bonded to the stranger, non-relatives, and suggesting to the court that it is not fair to move the children to relatives as a sanction for the unlawful job performance and system misfeasance and malfeasance. Surely the Foster System Operators would not argue that kidnappers of youngsters like Patty Hearst or Elizabeth Smart should get to keep children they kidnap because of the length of time and the "bonding" time law enforcement takes to find them!

221.   The policies, practices, abuses of power, acts and omissions of Defendant Foster System Operators constitute actions contrary to the best interests of the children taken into the system and steal the children from their families illegally and unconstitutionally, violating the Fourteenth Amendment to the Constitution of the United States.

222.   As a result, the Plaintiff Families are entitled to the declaratory and injunctive relief set forth.

## REMEDY AT LAW INADEQUATE

223.   Each day that the Defendant Foster System Operators delay their compliance with controlling laws, the children and their Families are damaged. There is no plain, adequate, or complete remedy at law, as the ordeals the Plaintiff Families have encountered, as courthouse doors and case remain locked and case information showing the wrongful deeds of the System Operators remain hidden by the Defendant Foster System Operators.

224.   These Plaintiff Families and the Families of Floridians with children who are being scouted even now to determine who the next targets may be will continue to be irreparably injured by the Defendants' policies, practices, acts, and omissions until and unless this Court grants the injunctive relief requested.

225.   With each day  that the Defendants delay their compliance with the law, continue their unlawful custody of Florida children whose Birth Parents have been wrongly or unfairly targeted, Florida Families are being harmed and losing valuable rights for which there is  no adequate remedy at law for damages and can only request this Court to immediately order the Defendants to stop their unlawful child taking and their wrongful internal diversion

activities and to immediately begin complying with the provisions of federal and Florida foster system laws. Every Florida family with children are at risk of their children being targeted and taken by the Defendant Governor and the other Foster System Defendants

## **RELIEF REQUESTED**

226.   Plaintiff Families   request the Court to   declare   unlawful the Defendants' policies and practices of  ignoring Florida and federal  foster care laws and the federal  and Florida due process provisions of  unlawful child diversions, presenting incomplete evidence, withholding evidence from the Court and Birth Parents and their attorneys, preventing dependency court proceedings from being  fair and impartial, and wrongly preventing the access of  relatives to receive information and be present at hearings  relating to children targeted by the Foster System Defendants.

227.   Plaintiff Families further request the Court to provide temporary injunctive relief and a permanent injunction requiring the Defendants to operate the foster care system in accordance with the state and federal  laws in effect, and to stop ignoring  the procedural and substantive due process rights of Florida's Children and their Birth Parents and other relatives.

228.   The injunction must stop, immediately, the current practice of wrongful child taking and internal diversion from relatives to system-connected nonrelatives.

229.   The injunction must stop, immediately, the Defendant Foster System Operators' practice of allowing children to be placed with system-connected nonrelatives, unless and until Foster System Operators provide accurate information documenting that a proper family finding search has been completed, with the diligent search demonstrating that there are no suitable, willing available relatives to be caregivers for sheltered children.

230.   The injunction should prohibit CPT from having their unsupervised or improperly supervised nurse practitioners seeing if they can find children to target for child takings and internal diversions so that system-connected nonrelative  personnel can acquire children who should be with relatives,  and who would  be with relatives if the foster system officials complied with their diligent search requirements to find safe relative caregivers when children cannot safely be returned to the Birth Parents from whom they are being taken.

231.   The injunction should require Defendant Foster System Operators to refrain from using perjured testimony in dependency proceedings and to notify the local state attorney of any perjured testimony that is offered.

232.   Defendant Foster System Operators should be required to immediately and promptly provide dependency judges and Birth Parents with potentially exculpatory evidence not offered at trial.

233.   Defendant Foster System Operators should be prohibited from fabricating false reports in order to try to disqualify relatives as caregivers, and the Defendant Foster System Operators should be required to immediately provide any relative disqualified from serving as a relative caregiver the information needed to correct the errors in the system-fabricated reports.

234.   Defendant Foster System Operators should be prohibited from separating siblings from each other without a sibling separation assessment from being completed, in an accurate and appropriately professional way.

235.   Defendant Foster System Operators should be required to make sure that non-abusive siblings receive at least two hours per week of direct contact with each other, and that grandparents are given notice of their right to an evidentiary hearing on their right to visit their grandchildren.

236.   Defendant Foster System Operators and their attorneys should be prohibited from communicating secretly with the presiding dependency court

judge about the case, and any Defendant Foster System Operators should not be allowed to be represented in any other dependency proceedings if their attorneys are found to have engaged in secret *ex parte* communications with the dependency judge, and attorneys for Foster System Operators known to have engaged in *ex parte* communications shall be prohibited from representing Foster System Operators or training other attorneys to represent Foster System Operators.

237.   The injunction should require Defendant Foster System Operators to promptly correct false statements in home studies, and to remove those whom they listed on the abuse registry to remove the falsely labelled persons from the registry, and to delete, and not use again, the false statements, including those relating to Lisa Crutch and Simone Wilson.

238.   The injunction should require all attorneys acting on behalf of the Florida foster care system to submit an affidavit on personal knowledge certifying the facts in each case with out of state relatives of children in state foster care, to timely demonstrate Florida's compliance, at the time of shelter and the first hearing after a TPR judgement,  with diligent search, family finding and the notice and hearing requirements of Florida's Uniform Child Custody Jurisdiction Enforcement Act.

WHEREORE Plaintiffs demand judgement against Defendants and pray for the following relief:

    a.  A preliminary and permanent injunction against Defendants and its directors, officers, agents, employees and representatives and in and all persons acting in concert with them from engaging in each of the unlawful practices set forth herein;

    b.  A declaratory judgement that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. 1988;

    c.  The entry of an order assessing their costs and reasonable attorney's fees against the Defendants pursuant to 42. U.S. C. § 1988;

    d.  Such further relief as the Court deems appropriate.

Dated this 15 date of June, 2022.

/s/ *Karen Gievers*
**Karen Gievers, Esq**.,
Florida Bar No.: 262005
P.O. Box 16459
Tallahassee, Florida 32317
PH: 850.570.0425
Kgievers@karengievers.com

*And*

/s/ Octavia Brown

**Octavia Brown, Esq**.,
Community Law for Families
and Children, PLLC
Florida Bar No.: 0011778
**Valentina Villalobos, Esq.,**
Community Law for Families and
Children, PLLC
Florida Bar No.: 100426
3104 N. Armenia Avenue, STE 2
Tampa, Florida 33607
PH: 813.822.3522
FAX: 863.250.8228
Octavia.brown@community-lawyer.com
Valentina.villalobos@community-
lawyer.com
*And*

/s/ Aaron Rapier
**Aaron Rapier, Esq.,**
Rapier Law Firm
*Motion for Pro Hace Vice Forthcoming*
Illinois Bar No. 6270472
1770 Park Street, Suite 200
Napierville, Illinois 60563
PH: 630.853.9224
arapier@rapierlawfirm.com

*Trial Attorneys for Plaintiffs*